**CONCORD REALTY COMPANY,
Plaintiff–Appellee,**

v.

**CONTINENTAL FUNDING CORPORA-
TION, Defendant–Appellant.**

**No. 88SA163.**

Supreme Court of Colorado,
En Banc.

July 24, 1989.

John Giduck and Philip E. Lowery, Denver, for plaintiff-appellee.

Davis, Graham and Stubbs, Thomas P. Johnson, Denver, and McDermott, Will & Emery, Stephen C. Sandels, Bruce Weitzman and Mark L. Yeager, Chicago, Ill., for defendant-appellant.

ROVIRA, Justice.

In this appeal,[1] Continental Funding Corporation (Continental) seeks review of the $25,345,104 judgment entered in favor of Concord Realty Company (Concord). Continental contends that the trial court's findings of fact and conclusions of law were erroneous. We agree and therefore reverse and remand for a new trial.

## I.

This action arose out of a complex loan transaction between Concord and Continental, which culminated in the execution of two promissory notes, the first in the principal amount of $5,245,000, the second in the principal amount of $855,000. These notes were secured by a wrap-around deed of trust encumbering 4,679 acres of undeveloped land in Douglas County, Colorado.

In the spring of 1982, Concord approached Continental regarding possible financing for the acquisition of certain parcels of land in Douglas County, Colorado. Concord had already purchased adjacent parcels of land, which were subject to purchase money notes secured by trust deeds. The additional parcels Concord wished to purchase would increase its total land holdings to 4,679 acres. In addition, Concord and its president, Lex Dolton (Dolton), wished to borrow the further sum of $855,000 to be used to complete the drilling of two oil and gas wells in Utah.

Based on discussions between Concord and Continental in the spring of 1982, a commitment letter dated May 28, 1982 was sent by Continental and accepted by Concord on June 14, 1982. The letter provided

---

1. This case was certified by the court of appeals to the supreme court, pursuant to section 13–4–109(1)(a), 6A C.R.S. (1987). We accepted jurisdiction of the case because of a claimed violation of the Colorado Constitution. We do not address the constitutional issue because the case may be determined on nonconstitutional grounds.

for a $5.5 million loan secured by a wrap-around deed of trust on the 4,679 acres of land that Concord was planning to develop. The commitment letter assumed that the prior encumbrances on the land amounted to $2.5 million, and that Continental would make available approximately $3 million in new funds. Concord would be required to repay the loan with interest at the rate of 19% per annum within a year. The commitment letter also contained several conditions,[2] and was designed to expire on June 30, 1982 if the loan was not funded by this time. The loan did not close by June 30, 1982.

Negotiations continued throughout the summer. During the negotiations, the parties agreed on three conditions which had to be met before the $855,000 oil and gas loan would be disbursed. The parties agreed that Concord would obtain and deposit with Continental $500,000 in cash or certificates of deposit, which, when combined with the $855,000 from Continental, would provide sufficient funds to complete the wells. Second, Concord would obtain and deliver to Continental a $325,000 letter of credit, and third, Concord would provide title opinions on the wells. None of these conditions was ever met. In June 1982, Concord conveyed to Continental a 10% carried working interest in one of the wells (Well 13–1), and a 5% carried working interest in the other well (Well 22–1) was conveyed by Dolton and Concord in September, 1982. In addition, the wells were assigned by Dolton and Concord to Continental in September 1982, as security for Concord's obligation to meet the three conditions enumerated above.

On September 10, 1982, the parties closed the loan transaction. Concord executed two promissory notes to Continental, the first note in the principal amount of $5,245,000, and the second note in the amount of $855,000. In addition, a wrap-around deed of trust encumbering the 4,679 acres, a closing statement, a subordination agreement and a security assignment were executed. Both parties were represented by attorneys at the closing.

The closing statement showed that $2,727,754.29 represented the total amounts due on prior encumbrances on the land after subordination of $600,000 of underlying debt. Cash in the amount of $938,798.71 was disbursed to Concord to enable it to acquire the Douglas County land. Continental set aside $433,936 to cover the interest which Concord would owe Continental on the borrowed funds during the year-long term of the note. An additional $379,586 was set aside by Continental to pay interest and principal owed by Concord to the holders of prior purchase money notes on the Douglas County land during the year term of the loan. Continental undertook the responsibility of making the payments on the prior encumbrances from September 10, 1982, to September 9, 1983. In addition, Continental retained funds to cover certain expenses, including: (1) a $165,000 origination fee; (2) legal fees of $10,000; (3) an inspection fee of $776; (4) an appraisal fee of $5,500; (5) $74 for credit reports; and (6) Federal Express charges of $75. Continental credited Concord with the $16,500 paid by Concord for the May 28, 1982 commitment letter. The $855,000 note signed by Concord represented the amount to be loaned for the completion of the oil and gas wells in Utah.

During the one-year term of the loan, Continental made the payments required on the underlying purchase money notes, for the benefit of Concord. Also during the year, Continental and Concord attempted to arrive at an alternative agreement concerning the $855,000 designated for the development of the wells. Concord's rights to one of the wells, No. 13–1, lapsed in Sep-

2. For example, the commitment letter required that an opinion letter be issued by Concord's attorneys attesting that the interest rate on the loan did not exceed the rate allowed under Colorado law; that Concord obtain prior to the loan closing four real estate contracts for forty-acre "ranchettes" on the land Concord was de-veloping; that the funding of the loan be conditioned on Continental's obtaining 75% participation by other lenders; that Continental be able to verify sufficient financial standing or creditworthiness of Concord and Dolton to qualify for the loan; and that the commitment letter be accepted without change.

tember 1982. No agreement was ever arrived at, and the $855,000 promissory note was never funded.

The principal amount of the $5,245,000 note came due in September 1983. Concord was unable to repay the loan. Continental continued to make payments on the underlying purchase money notes until June 1984, when it initiated foreclosure proceedings through the Public Trustee of Douglas County. Continental filed a foreclosure bid computation which totalled $2,584,920.41. This amount represented the principal and interest owing under the note, travel fees, legal fees, attorney fees, and public trustee fees. On August 13, 1984, Concord filed a complaint against Continental in the Douglas County District Court and obtained a temporary restraining order to prevent the foreclosure. After a hearing, a preliminary injunction further preventing the foreclosure was entered. Trial on the merits of the parties' claims was held in December 1984.

Concord's amended complaint, in addition to seeking injunctive relief, stated claims of (1) failure to comply with C.R.C.P. 120, and provisions pertaining to notice listed in the deed of trust; (2) violation of Colorado's usury statute; (3) a declaratory judgment that the note and deed of trust were null and void as being against public policy; (4) promissory estoppel and unjust enrichment; (5) fraud; (6) breach of contract; (7) exemplary damages; and (8) illegal encumbrance of real property. Continental's answer denied liability, and asserted as affirmative defenses failure to state a claim, waiver, estoppel, failure to comply with conditions precedent, superseding breach of contract by the plaintiff, and fraudulent inducement. Continental counterclaimed for the balance of the note allegedly owed by Concord.

At trial, Roger Butterwick, a witness for Concord, testified as to the effective rate of interest that was charged on Concord's loan, over Continental's objection. Butter-

wick calculated a 46% interest rate by taking the amounts found in Continental's foreclosure bid and comparing them to those amounts actually received by Concord and those amounts expended on Concord's behalf to pay down the prior encumbrances. Butterwick also testified to an alternate calculation which valued the conveyed interest in the oil and gas wells at approximately $10 million, thus arriving at an effective interest rate of 264%. In conjunction with Butterwick's testimony, two exhibits demonstrating his calculations were admitted over Continental's objection.

The trial court found that Continental had charged interest on amounts which were not disbursed, and that the interest on the loan amounted to 46%. Additionally, the trial court found that Continental defrauded Concord in several respects. The trial court awarded Concord damages in the amount of $11,716,500 to compensate for (a) the $16,500 commitment fee; (b) the $1,700,000 allegedly expended by Concord on the oil and gas wells; and (c) the value of the lost oil and gas wells, $10 million. The trial court voided the two promissory notes and the wrap-around deed of trust, and entered judgment against Continental in the sum of $15 million for exemplary damages. Finally, the trial court allowed a set-off of $1,371,396 because Concord "received the benefit of this amount...."[3]

On appeal, Continental contends that the trial court's findings of fraud were erroneous and contrary to the evidence; that the trial court erred in admitting the calculations of Roger Butterwick; and that the trial court's assessment of compensation damages and award of punitive damages was improper. We address each of these contentions in turn.

## II.

## FRAUD

■ In order to prevail on its claim for fraud, Concord was required to establish:

---

**3.** The trial court arrived at the $1,371,396 figure based on Butterwick's calculations of principal and interest. On appeal, Continental claimed that the set-off should have included the princi-

pal amount of $1,987,287.25, plus interest, attorney fees, and costs. The parties have resolved this dispute and the issue is no longer before us.

(1) a false representation of a material existing fact; (2) knowledge on the part of the one making the representation that it was false; (3) ignorance on the part of the one to whom the representation was made of its falsity; (4) the representation was made with an intention that it be acted on; and (5) the representation resulted in damage. *Kinsey v. Preeson*, 746 P.2d 542 (Colo.1987). Continental contends that the trial court's findings of fraud were contrary to the evidence. We agree.

■ The trial court first indicated that the transaction was fraudulent because the commitment letter proposed a $5,500,000 loan of which approximately $3 million would be available to Concord as new money, but only $938,000 was disbursed to Concord in cash at the closing. However, the commitment letter may not be used as a yardstick to measure this transaction. A commitment letter is essentially an option which may be exercised by the borrower, but only in strict compliance with its terms. *Analytical Design & Const. Group v. Murray*, 690 P.2d 269 (Colo.App.1984). Here, the letter expired by its own terms if the loan was not funded by June 30, 1982. It is uncontroverted that the loan was not funded by that date and therefore the expired commitment letter may not be considered a representation upon which Concord had a right to rely. In addition, there is no evidence that Concord was misled by the statements in the commitment letter. In fact, Dolton, as president of Concord, testified that the commitment letter was not a final document, and because the loan was not closed prior to June 30, 1982, the terms of the letter were not binding.

Finally, there was no evidence that Continental, at the time it sent the commitment letter, knew that these statements were false or intended to mislead Concord as to the terms of the agreement. Although the trial court found that Continental "never intended to disperse [sic] to the plaintiff the $5,245,000," there is no evidence to support this finding. Moreover, there was no indication that Continental had ever represented that it would disburse $5,245,000 directly to Concord. From its inception, this loan transaction contemplated wraparound financing,[4] which by its very terms precludes payment of the full face of the note directly to the borrower. Rather, the face amount of the note includes sums owed to holders of prior encumbrances on a parcel of land, which the lender will pay directly to the prior lienholders when such sums are due. Even the commitment letter indicates that only $3 million would be considered new money, and of that amount, $2,140,000 would be utilized to fund several reserves, a financing fee, and to pay for certain expenses incidental to the loan. Because the trial court's finding of fraud based on discrepancies between the commitment letter and the actual loan transaction is not supported by the evidence, it must be reversed.

■ The trial court also found that Continental fraudulently represented to Concord that it would fund the $855,000 note when it had no actual intention of ever doing so, and that it had $855,000 available to disburse to the plaintiff when the money was actually unavailable. These findings by the trial court are findings of fact which ordinarily would not be disturbed on review. However, a review of the record indicates that there is no evidence to support the trial court's findings. *See Page v. Clark*, 197 Colo. 306, 592 P.2d 792 (1979).

The trial court found that after the September 1982 closing, when the promissory note for $855,000 was signed by Concord, Continental refused to disburse the amount and imposed further conditions which Con-

**4.** "[A] wrap-around mortgage is one in which the lender gives a loan secured by a mortgage on property that is already encumbered by a first mortgage. The face amount of the new loan includes the remaining principal on the existing first mortgage, plus the amount being advanced on the second. The interest payable to the second mortgage is computed on this total amount. The second mortgagee, in turn, makes the payments required by the terms of the first mortgage directly to the first mortgagee. The wrap-around lender sometimes assumes the first mortgage, although this is not always the case." *Neville Enterprises, Ltd. v. Rahe*, 631 P.2d 1196, 1197 (Colo.App.1981) (quoting 3 R. Powell, *The Law of Real Property* ¶ 475.7 (P. Rohan rev. 1979)).

cord had to meet before the $855,000 would be disbursed. The trial court found that the additional conditions imposed required Concord to put up a certificate of deposit in the amount of $500,000, to provide a letter of credit in the amount of $325,000, and to furnish title policies to the two oil and gas wells as collateral for the loan. The trial court gave great weight to this finding of fact in its determination that Continental defrauded Concord. However, the record clearly indicates that these three conditions had been agreed to by Continental and Concord well in advance of the closing. Even the president of Concord, Dolton, indicated in his testimony that the three conditions had been imposed prior to the September 1982 closing, but that Concord had never met any of the requirements.

In addition, the trial court found that Concord directly assigned its interests in the oil and gas wells, after the closing, in a final effort to salvage the $855,000 loan. This finding of fact is also contrary to the evidence. The evidence establishes that the assignment of the wells took place at the closing itself, not after the note was signed. The assignment was for security purposes only, and was to be released when Concord met the agreed-upon conditions for disbursement of the $855,000 loan balance. There is no evidence to support the finding that Continental imposed further conditions after the $855,000 promissory note was signed in September 1982. Because the trial court based its determination that Continental never intended to fund the $855,000 note and that it misrepresented the availability of funds on erroneous factual findings, the trial court's finding of fraud must be reversed. It may well be that Continental did not intend to fund the $855,000 note or knew that it did not have that amount available to disburse, but this issue must be determined in a new trial. The trial court's findings of fact and conclusions of law cannot stand based on the record of the trial in this case.

■ Finally, the trial court found the existence of fraudulent misrepresentations concerning the treatment of interest on the loan and fees assessed on the loan. First, the trial court found that Continental fraudulently charged Concord with an origination fee of $165,000 "which was equivalent to approximately 20% of the loan proceeds dispersed [sic] to the plaintiff at closing." At trial, Dolton, as Concord's president, testified that he "assumed" that the 3% origination fee would only be applied to those amounts actually obtained by Concord. However, the loan documents make it quite clear that the 3% origination fee would be assessed against the face amount of the loan, rather than on the amount actually placed in Concord's hands.[5] There is no evidence which would indicate a representation by Continental that the origination fee would be handled in any other way. In the absence of such a representation, there could be no fraud. *See Ficor, Inc. v. McHugh,* 639 P.2d 385 (Colo.1982).

■ The trial court also found Continental represented to Concord that the loan proceeds would be treated as a "construction loan." The court found that this representation was false because Continental charged Concord with interest on the whole amount of the loan from the beginning rather than what was disbursed at the time of closing. Additionally, the court indicated that Continental charged Concord with interest on the $855,000 loan, although it was never disbursed. Neither of these findings of fact is supported by the record. Aside from the origination fee, Concord was only charged with interest on those amounts actually disbursed at closing. This includes the amount actually placed at Concord's disposal, $938,798.71, the two reserves which were funded at closing, and the various fees for services which Concord agreed to pay. In addition, aside from the origination fee, Concord was not charged with any interest stemming

---

5. The commitment letter originally contemplated a $5,500,000 loan, upon which the 3% origination fee would be based. In the actual transaction, the origination fee was calculated by adding the face amount of the two promissory notes, $5,245,000 and $855,000, and then subtracting $600,000, which represented the amount of underlying debt which was subordinated by the prior lienholders. Three percent of this amount equals $165,000.

from the $855,000 promissory note. There may be a factual question as to whether Continental misrepresented the manner in which interest would be calculated in this transaction. However, because the trial court's factual findings are without foundation, this issue must be determined at a new trial.

### III.

### USURY

The trial court never made a specific finding that the loan transaction in this case was usurious. However, the court accepted Butterwick's conclusion that an effective interest rate of 46% was charged on the loan, and this interest calculation appears to have contributed to the court's findings of fraud. We therefore examine Butterwick's calculations to determine whether the trial court's decision may be upheld.

■ Continental contends that Roger Butterwick's testimony should not have been admitted because it was based on improper premises. Continental first alleges that the foreclosure bid could not be used as the basis for a usury computation pursuant to section 5–12–103, 2 C.R.S. (1973). We agree.

Section 5–12–103, 2 C.R.S. (1973), limits the amount of interest which may be charged on a non-consumer transaction to 45% per annum. In order to determine whether the 45% limitation has been exceeded, the statute explicitly provides a formula:

The rate of interest shall be deemed to be excessive of the limit under this section only if it could have been determined at the time of the stipulation by mathematical computation that such rate would exceed an annual rate of forty-five percent when the rate of interest was calculated on the unpaid balances of the debt on the assumption that the debt is to be paid according to its term and will not be paid before the end of the agreed term.

The statute makes it clear that the interest rate is to be calculated from the time of contracting assuming that the debt will be paid according to its terms. Further evidence that the usurious nature of a transaction must be determined from its inception is found in the fact that while the usury statute for consumer transactions prohibits either the contracting for or the receipt of finance charges in excess of the statutory limitations,[6] section 5–12–103, 2 C.R.S. (1973), prohibits only the contracting for an interest rate above 45%. When examining a consumer transaction for usury, the transaction may be looked at retrospectively to determine whether a lender has actually received an interest rate above that which is allowed. In contrast, in a non-consumer transaction, the interest rate must be computed from the inception of the transaction rather than looking at the end results.

Butterwick, in his computations, took the amounts found in the foreclosure bid and compared them to the principal amounts stated in the loan closing statement. This retroactive computation was error, especially because there was a default on the loan which resulted in the accrual of additional interest. Because his method of calculation was contrary to statute, his testimony should not have been admitted as competent evidence to establish a usurious rate of interest.

■ Continental also contends that Butterwick improperly designated certain items as interest which should have been credited to principal. In his computation, Butterwick designated as principal only the amount actually placed at Concord's disposal at the closing and the amounts actually paid to the holders of prior encumbrances.[7] The remaining amounts, including the interest reserve, the legal fees, the origination fee, the appraisal fee, the inspection

6. § 5–3–110, 2 C.R.S. (1973).

7. In computing the principal amount advanced, Butterwick did not treat the reserve account for payment of the underlying debts as principal which was advanced at the closing. Rather, he only credited payments on the underlying notes to principal at the time they were actually received by the prior lienholders.

fee, the charge for credit reports, and the Federal Express charges, were allocated to interest. We believe that Butterwick improperly designated certain items as interest rather than principal.

Section 5–12–103(2), 2 C.R.S. (1973), defines interest as:

> [T]he sum of all charges payable directly or indirectly by a debtor and imposed directly or indirectly by a lender as an incident to or as a condition of the extension of credit to the debtor, whether paid or payable by the debtor, the lender, or any other person on behalf of the debtor to the lender or to a third party.

Although this is not a consumer transaction, as defined,[8] we turn to the Uniform Consumer Credit Code (U.C.C.C.) in order to determine which items should be designated "interest" under the usury statute. We use the U.C.C.C. as a guide because the history and language of the statutes make it apparent that the General Assembly intended to create a comprehensive scheme to regulate the extension of credit.

The current version of the U.C.C.C. was enacted in 1971 to reflect the Federal Consumer Credit Protection Act, 15 U.S.C. § 1601 et seq. (1968). *See* § 5–1–102(2)(f), 2 C.R.S. (1973). In enacting the U.C.C.C., Colorado originally did not limit the interest which could be charged in a non-consumer transaction. However, in 1972, Colorado enacted a 45% ceiling to reflect the criminal usury provisions added that year to the Colorado Criminal Code. *See* Colorado Comment to § 5–3–605, 2 C.R.S. (1973), and Colorado Comment to § 5–12–103, 2 C.R.S. (1973). In enacting the general usury limitation, which applies to non-consumer transactions, the General Assembly defined the term "interest" using the exact language which is used to define the term "loan finance charge" in the statutes regulating consumer credit transactions.[9]

The U.C.C.C. contains several provisions which further define which charges constitute principal, and which charges constitute the loan finance charge. Because the definition of "interest" in the non-consumer context is identical to the definition of "loan finance charge" in the consumer context, we look to these additional provisions in order to determine which charges may be allocated to principal or interest.

*The Origination Fee.* Section 5–3–109(1), 2 C.R.S. (1973), gives certain examples of charges which are to be considered part of the "loan finance charge." The list of examples includes "any amount payable under a point, discount, or other system of charges, however denominated, premium, or other charge for any guarantee or insurance protecting the lender against the debtor's default or credit loss." This definition appears to encompass a loan origination fee as a charge which is "an incident to or a condition of the extension of credit." Further evidence that the origination fee should be computed as "interest" under section 5–12–103, is found in the Federal Consumer Credit Protection Act, upon which our act was modeled. 15 U.S.C. § 1605 (1968) includes a definition of finance charge identical to that contained in our statute. The federal statute provides examples of finance charges including "any amount payable under a point, discount, or other system of additional charges ... [or] service or carrying charge ... [or a] loan fee, finder's fee, or similar charge." Although neither the Colorado nor the federal definition uses the term "origination fee," such a charge is often referred to as "points" or a "loan fee." Thus, it appears that the origination fee was properly included as an element of interest in Butterwick's computations.

*The Appraisal Fee, Inspection Fee, Credit Reports, Federal Express Charges, and Legal Fees at Closing.* The U.C.C.C. exempts "reasonable closing costs" from the definition of finance charges when a

---

8. § 5–3–104, 2 C.R.S. (1988).

9. Section 5–3–109(1), 2 C.R.S. (1973), provides: "Loan finance charge" means the sum of all charges payable directly or indirectly by the debtor and imposed directly or indirectly by the lender as an incident to or as a condition of the extension of credit, whether paid or payable by the debtor, the lender, or any other person on behalf of the debtor to the lender or to a third party....

debt is secured by an interest in land. *See* § 5-3-202(3), 2 C.R.S. (1988). "Closing costs" with respect to a debt secured by an interest in land are defined as:

(a) Fees or premiums for title examination, title insurance, or similar purposes including surveys,

(b) Fees for preparation of a deed, settlement statement, or other documents,

(c) Escrows for future payments of taxes and insurance,

(d) Fees for notarizing deeds and other documents,

(e) Appraisal fees, and

(f) Credit reports.

§ 5-1-301(5), 2 C.R.S. (1973). These same charges are exempted in the federal counterpart to our statute. *See* 15 U.S.C. § 1605(e) (1968). Because "closing costs" include those charges made by Continental for the above enumerated items, Butterwick improperly allocated such charges to the category of "interest" in his computations.

*The Interest Reserve on New Funds and the Reserve Account for the Payment of the Underlying Notes.* The U.C.C.C. makes no specific provision for such reserve accounts. Therefore, we must determine whether such reserve accounts constitute principal or interest in accordance with the general provisions of the U.C.C.C. We look first to the definition of principal provided in section 5-3-107(3), 2 C.R.S. (1973), which states that the "principal" of a loan includes "the net amount paid to, receivable by, or paid or payable for the account for the debtor...." Here, the reserve account for the payment of the underlying notes clearly comprised an amount payable for the account of the debtor, and would appear to constitute principal. The interest reserve also constituted a sum payable for the account of the debtor. If such amounts were not reserved, Concord would have had to pay the interest during the term of the loan. Thus, both of the reserve accounts relieved Concord from advancing the funds during the term of the loan, and therefore constituted amounts payable on Concord's account.

In addition, the definition of "closing costs" includes escrows which are reserved for future payments of taxes and insurance. Such escrow accounts are intended to protect and preserve the collateral in a loan transaction which is secured by an interest in land. So too, the reserve account for payment of the underlying promissory notes protects and preserves the collateral from foreclosure. Therefore, the reserve for payment on the underlying notes would fall into the category of closing costs which are excluded from the finance charge under the U.C.C.C. We believe that the two reserve accounts constituted principal for the purposes of calculating the interest rate, and that Butterwick improperly excluded these reserves from the principal amount in his calculations.

*Interests Assigned in Well 22-1 and Well 13-1.* Butterwick, in his testimony, included the value of the two oil and gas wells as an element of interest paid to Continental in consideration for making the loan. As explained more fully in the damages section of this opinion, Butterwick's valuation of the assigned interests in the wells cannot stand. However, because the trial court apparently relied on Butterwick's interest computation in finding that Concord was defrauded, we briefly address the issue whether the assignment of the carried working interests in the wells constitutes interest for the purposes of usury.

Because the interest definition includes any amounts transferred directly or indirectly from the debtor to the lender, the carried working interests in the wells should constitute interest if they can be adequately valued at the time of contracting. However, such carried working interests are subject to a myriad of uncertainties which make it difficult to place a value on the interests transferred. It is the general rule that a loan in consideration of a share in profits, income, or earnings, in lieu of, or in addition to, interest, is not usurious, in the absence of certainty that the arrangement would produce a return in excess of the legal rate of interest, though the principal is to be repaid in any event. Annotation, *Agreement for Share in*

*Earnings of or Income from Property in Lieu of, or in Addition to, Interest as Usurious,* 16 A.L.R.3d 475 (1967). Thus, in a new trial, the trial court must determine whether the value of the carried working interests may be ascertained with sufficient definiteness to be considered as interest in computing the interest rate.

Because Butterwick's testimony concerning the effective interest rate charged on the principal amount loaned in this transaction was based on improper premises, his calculations were incompetent to establish the interest rate for the purposes of the usury statutes. Therefore, the trial court erred in admitting this testimony, and in relying on Butterwick's computations in order to find the existence of fraud.

## IV.

## DAMAGES

The trial court assessed against Continental damages in the amount of $11,716,500. This compensatory damage award was comprised of three elements: $16,500 represented the amount paid by Concord for the commitment letter; $1,700,000 as the amount allegedly expended by Concord on the oil and gas wells prior to this loan transaction; and $10 million, representing the value of the lost wells. The computation of these compensatory damages is contrary to the evidence, and must be reversed.

▆▆▆ The $16,500 damage award is improper because this amount was already credited to Concord at the closing. Thus, Concord could not be damaged in this amount. The $1,700,000 compensatory award was improper because the only evidence in the record indicates that prior to September 1982, Dolton, not Concord, expended this amount on Well 22-1, in which Concord had no ownership interest. Therefore, assuming the existence of fraud, Concord could not have been damaged in that amount.

▆▆▆ Finally, the $10 million damage award to compensate for the loss of the oil and gas wells was improper because there is no competent evidence in the record to

support it. The $10 million valuation was arrived at based on Butterwick's testimony. In his computation of the effective interest rate of the loan, he relied on a figure, supplied to him by Concord for purposes of the computation, which purportedly represented the value of Well 13-1. This figure was contained in a prospectus prepared by Concord entitled "Uintah Basin Project, Home Joint Venture." Butterwick indicated that he had no expertise in valuing oil and gas wells, thus he had to rely upon the figures supplied to him by Concord. Butterwick testified that he simply used this figure for the purposes of his calculations, making no determination what percentage of the well was owned by Concord and making no adjustments to reflect the nature of a carried working interest in a well, which is subject to the expenses of drilling and production. In addition, Butterwick testified that he did not make any adjustments for the drop in gas prices between the time that the prospectus was prepared and the time that the interests were conveyed, nor did he know whether the well was actually in production, and he did not apply any risk factor to discount the $10 million figure for the risks that might be involved. It is clear that the $10 million figure was used by Butterwick for the purposes of his interest calculations only, and was not his expert valuation of the wells. In addition, the record contains no evidence concerning the percentage of Concord's ownership interest, if any, in Well 13-1, so as to provide a basis to determine the amount in which Concord was damaged. Because there is no competent evidence to support it, the damage award must be reversed.

▆▆▆ Continental also disputes the trial court's award of $15 million in exemplary damages because the evidence of fraud was insufficient and because Continental's financial situation was not considered in making the award. Exemplary damages may be awarded upon a finding of fraud by the trier of fact. *See* § 13-21-102, 6A C.R.S. (1987). However, there can be no award of exemplary damages in the absence of a successful underlying claim for

actual damages. *Harding Glass Co. v. Jones,* 640 P.2d 1123 (Colo.1982). Therefore, because we have reversed the trial court's findings of fraud, the award of exemplary damages must also be reversed.

Accordingly, we reverse the judgment of the trial court and remand for a new trial.