**Lucy S. DIKEOU, Petitioner,**

v.

**John P. DIKEOU, Respondent.**

No. 95SC699.

Supreme Court of Colorado,
En Banc.

Dec. 9, 1996.

Rehearing Denied Jan. 13, 1997.

McKenna & Cuneo, L.L.P., Daniel S. Hoffman, Scott S. Evans, Denver, for Petitioner.

Lance P. Vanzant, Denver, for Respondent.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' decision in *Dikeou v. Dikeou,* 916 P.2d 601 (Colo.App.1995).[1] The court of appeals held that late charges of a set dollar amount per day which were provided in a contract for a nonconsumer loan secured by a promissory note were impermissible penalties that are unenforceable under Colorado law. Because we now conclude that the late charges in this case are properly characterized as "default interest" and are reasonable as analyzed under the nonconsumer loan usury statute at section 5–12–103, 2 C.R.S. (1992), we reverse.

## I.

On December 30, 1987, respondent, Lucy Dikeou (creditor), and petitioner, John Dikeou (debtor), entered into a nonconsumer loan agreement in which the creditor lent $900,000 to the debtor and the debtor signed a promissory note payable to the creditor in that amount. Pursuant to this promissory note, the debtor agreed to pay interest of $9,750 per month (13% per annum of the principal) with the entire $900,000 principal due and payable in a balloon payment on or before August 30, 1988. In addition, the terms of the promissory note provided for late payment charges in the amount of $700 per day on payments more than one day late and a $50,000 penalty should the debtor fail to pay certain costs of insurance and appraisals respecting real estate that secured the note.

Approximately one year later, on December 23, 1988, the parties modified the original promissory note. The terms of the modified note extended the maturity date to December 30, 1989 and permitted the debtor to request a further extension to August 30, 1990. The modified note also provided that the terms and conditions of the original note that were not specifically modified were to remain in full force and effect. Therefore, the monthly interest payment remained $9,750 and the daily late charge of $700 continued.

The debtor subsequently failed to make numerous interest payments and failed to pay the full principal amount by the modified date of maturity, August 30, 1990. Then, in October 1990, the debtor made a payment sufficient to pay all accrued interest and late charges, as well as to reduce the principal balance to $472,764.45. After paying down the principal, the debtor continued making interest payments of $5,121.61 per month (13% per annum of reduced principal) but did not reduce the principal or pay the late charges still accruing because of the debtor's continuing failure to repay the principal.

On August 15, 1991, the creditor demanded payment of both the note in full and the late charges calculated at a rate of $413.33 per day from November 1, 1990. The creditor then filed a complaint in Denver District Court, alleging that the debtor had defaulted on the modified note. Following a bench trial, the trial court entered judgment in favor of the creditor in an amount of $472,764.45 for the principal amount due on the modified note plus attorney fees and costs, with interest from the date of judgment at a rate of 8%. The trial court refused to enforce the daily late charge provision based on its conclusion that the late charges bore "no

---

1. We granted certiorari on the following issue: Whether the court of appeals erroneously determined that late payment charges provided for in connection with a nonconsumer credit arrangement constitute unenforceable penalties rather than "interest" as defined by § 5–12–103(2), 2 C.R.S. (1992).

relationship ... to any possible damage" that the creditor might have suffered due to the debtor's failure to repay the note according to its terms. The trial court also refused to enforce the $50,000 penalty.

The creditor appealed the trial court's decision on enforcement of the late charge provision and the penalty. The court of appeals affirmed the trial court's decision and concluded that it was "unnecessary to determine whether the late charges [were] usurious and in violation of § 5–12–103 since they are penalties that are unenforceable under the standards set forth in *Perino v. Jarvis*, 135 Colo. 393, 312 P.2d 108 (1957)." *Dikeou*, 916 P.2d at 603.[2]

## II.

The creditor argues that the court of appeals erred in applying *Perino* because it reversed the appropriate order of analysis. According to the creditor, before concluding that the late charges were impermissible penalties, the court of appeals first should have determined whether the charges were interest. We agree.

In *Perino*, this court considered whether a real estate broker was entitled to keep a $1000 deposit paid by the prospective buyer in connection with a failed attempt to purchase a beer business in Arizona. *Perino*, 135 Colo. at 394, 312 P.2d at 108. Although the oral agreement between the parties did not include any provision or understanding for the retention of the $1000 as liquidated damages, this court analyzed the broker's claim under the essential elements of a contract for the retention of a sum paid as liquidated damages. *Id.* at 396, 312 P.2d at 108–09. The essential elements were: (1) that the anticipated damages are uncertain in amount or difficult to prove; (2) that the

parties intend to liquidate the damages in advance; and (3) that the amount stated is a reasonable one and not greatly disproportionate to the presumable loss or injury. *Id.* at 396, 312 P.2d at 109. The *Perino* court concluded that, even assuming that the parties contended there was an agreement to liquidate damages, the necessary elements of such a contract were lacking. *Id.* at 397, 312 P.2d at 109.

The case before us bears no similarity to *Perino*. Here, the parties were engaged in a nonconsumer loan for $900,000. The debtor contracted to repay the loan with interest and to pay certain late charges if he failed to make timely payments, which he clearly failed to do. The *Perino* transaction was not a written nonconsumer loan, but rather an oral buy/sell agreement which failed to specify the disposition of the buyer's $1000 deposit in the event that the sale was not consummated. Under such circumstances, there could be no contention that the deposit was a form of interest or could be recalculated as a form of interest. There was no principal amount loaned and apparently the broker attempted to justify his retention of the deposit by asserting that the money was a form of liquidated damages.

Here, we agree with the creditor that the question is whether these late charges constitute "interest" as defined by section 5–12–103(2) and, if so, whether the late charges, when combined with the other interest charged in the loan, violate the usury law. *See Debtor–Creditor Law* ¶ 16.04[A][6][c] (Theodore Eisenberg ed., 1992)(legality of late payment charges turns on whether it constitutes interest charge under state usury law). In enacting the usury statute, the legislature determined that interest rates of up to 45% are reasonable and not usurious. *See* § 5–12–103(2), 2 C.R.S. (1992). Therefore, if

---

**2.** The court of appeals affirmed the trial court's decision with respect to the late charges and the $50,000 penalty, but reversed with respect to the proper post-judgment interest rate. The creditor now seeks review of the court of appeals' holding concerning the daily late charges. Neither party has challenged the court of appeals' conclusions concerning the $50,000 or the post-judgment in-

terest rate. Therefore, we do not address these issues here. Both parties have, however, argued for an award of attorney fees. Since their arguments rely on contract interpretation and equitable considerations, we find that the resolution of this issue is best left to the discretion of the trial court on remand.

the late charges in this case are determined to be interest and the total interest charged does not exceed 45%, then the late charges are reasonable as a matter of law and may be enforced.

## III.

■ We now must determine whether the late charges in this case are interest as defined by section 5–12–103(2), which states:

The term "interest" as used in this section means the sum of all charges payable directly or indirectly by a debtor and imposed directly or indirectly by a lender as an incident to or as a condition of the extension of credit to the debtor, whether paid or payable by the debtor, the lender, or any other person on behalf of the debtor to the lender or to a third party.

§ 5–12–103(2), 2 C.R.S. (1992). Section 5–12–103 also provides that interest "charges" are not usurious as long as the sum of all charges does not exceed 45%. § 5–12–103(1), 2 C.R.S. (1992). The statute does not specifically refer to late or default charges in the definition. Although we have not previously considered whether late charges are interest under this section of the usury statute, we have dealt with a similar issue in the context of federal banking law.

In *Copeland v. MBNA America Bank, N.A.*, 907 P.2d 87 (Colo.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2496, 135 L.Ed.2d 189 (1996), we considered whether late charges were interest under section 85 of the National Banking Act (NBA). Unlike the Colorado usury statute at section 5–12–103, section 85 of the NBA does not provide a definition for "interest." *Id.* at 90. In *Copeland*, a Colorado credit card customer initiated a class action alleging, in part, that late charges were not interest under the NBA because late charges are penalties. *Id.* We disagreed and concluded, based on prior cases interpreting the NBA, that late payment fees were included in the definition of "interest" at the time the NBA was enacted. *Id.* at 92. Therefore, we necessarily rejected

the customer's contention that interest should be defined narrowly to include only periodic percentage interest rates. *See id.* at 90.

Likewise, in *Stoorman v. Greenwood Trust Co.*, 908 P.2d 133 (Colo.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2498, 135 L.Ed.2d 190 (1996), we considered whether late charges were interest under section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDA). Congress incorporated the language of section 85 of the NBA into section 521 of the DIDA. *Id.* at 135. Concluding that similar language should be interpreted in the same manner, this court held that the rationale of *Copeland* was equally persuasive as applied to the DIDA. *Id.* Therefore, we concluded that late charges are interest under section 521 of the DIDA. *Id.* at 136.

In *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818 (1st Cir.1992), *cert. denied*, 506 U.S. 1052, 113 S.Ct. 974, 122 L.Ed.2d 129 (1993), the First Circuit Court of Appeals also considered whether late charges were interest under the DIDA. In its analysis, the *Greenwood* court reviewed the historical definition of "interest" and noted that the plain meaning of "interest" is not necessarily restricted to numerical percentage rates. *Id.* at 824. Citing both reference works and federal opinions, the court concluded that a "late fee is sufficiently related to the use and forbearance of money or damages for its detention that it can appropriately be classified as interest." *Id.* at 825. The *Greenwood* decision was cited as supporting authority in both *Copeland* and *Stoorman.*

Most recently, the United States Supreme Court held in *Smiley v. Citibank (South Dakota), N.A.*, —— U.S. ——, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996), that credit card late charges are interest under the NBA. In *Smiley*, a credit card holder alleged that the late charges assessed against her were impermissible penalties. *Id.* at ——, 116 S.Ct. at 1732. The Supreme Court concluded that it should necessarily defer to the reasonable interpretation of the agency charged with

regulating the Act. *Id.* at ——, 116 S.Ct. at 1735. With respect to the NBA, the Comptroller of Currency (Comptroller) had promulgated a regulation interpreting late charges as interest. *Id.* at ——, 116 S.Ct. at 1733; 61 Fed.Reg. 4869 (Feb. 9, 1996) (to be codified at 12 C.F.R. § 7.4001(a)).

The credit card customer in *Smiley* argued that the late fees were not interest because they did not vary based on the amount of the payment owed or the length of the delay. *Smiley,* —— U.S. at ——, 116 S.Ct. at 1735. In determining whether the Comptroller's interpretation was a reasonable one, the Supreme Court considered the historical treatment of late charges as interest. First, the Court noted that most legal dictionaries contemporaneous with the enactment of the NBA did not place such a limitation on the definition of interest. *Id.* at ——, 116 S.Ct. at 1735. Second, in response to the customer's argument that a charge must be time- and rate-based to be interest, the Court noted that "[a]ny flat charge may . . . readily be converted to a percentage rate. . . . And there is no apparent reason why home-state-approved percentage charges should be permissible but home-state-approved flat charges unlawful." *Id.* at ——, 116 S.Ct. at 1736 (citations omitted). In accord with our decision in *Copeland,* the Supreme Court concluded that the Comptroller's definition of interest was reasonable and was therefore entitled to deference. *Smiley,* —— U.S. at ——, 116 S.Ct. at 1736.

■ While these cases construing federal statutes are not controlling in the present case, the mode of analysis, which defined late charges by considering the traditional meaning and use of the term "interest," is persuasive. Consistent with that analysis, we agree that whether a charge is expressed as a flat fee or a percentage rate does not determine whether a charge is interest. As expressed in both *Greenwood* and *Smiley,* as long as the charge can be converted into a percentage rate, it correctly can be categorized as interest.

Applying this analysis to the specific language of section 5–12–103(2), we conclude that the late charges involved in this case properly should be categorized as interest. The usury statute permits parties to stipulate to the payment of charges "as an incident to or as a condition of the extension of credit" as long as the "sum of all charges" does not exceed 45%. § 5–12–103(1) & (2), 2 C.R.S. (1992). By using the phrase "sum of all charges" the legislature contemplated that the parties may provide for more than just a single percentage-based charge. In this case, the debtor agreed to the specific late charges both initially and again when the note was modified; the late charge provision was an express term of the promissory note. The late charge was a condition of extending credit after the initial default. It served to promote timely payments and to compensate the creditor for the increased risk and expense of lending money she incurred when extending credit to a debtor who already had failed to make timely payments. The parties agreed that the interest rate of the loan was 13% of the principal if the payments were made on time but if one or more payments were not made on time, a late charge was added which effectively increased the overall interest rate. In essence, the late charges were a "default interest" charge for the debtor's failure to pay off the note according to its terms.

Colorado has traditionally recognized that parties have the right to stipulate to a higher default interest rate when a loan is not paid off according to its terms. In *McKay v. Belknap Savings Bank,* 27 Colo. 50, 59 P. 745 (1899), this court was asked to determine whether parties can agree to an increased interest rate contingent upon nonpayment of either principal or interest when due. In *McKay,* the parties had agreed to an initial interest rate of 6% which would increase to 12% upon default. *Id.* at 51, 59 P. at 746. The usury statute in effect at that time allowed parties to stipulate to "the payment of a greater or higher rate of interest than eight per cent per annum." *Id.* at 54, 59 P. at 747 (quoting Section 2253, Mills' Ann. St.). The *McKay* court held that the statute allowed the parties to stipulate to a higher rate

contingent upon default, stating, "the parties to this note unquestionably had the right to stipulate that a larger rate should be paid upon the failure to pay a smaller one when due." *Id.*

More recently, the United States Bankruptcy Court for the District of Colorado held that a loan default rate of 24% was not unreasonable or usurious under Colorado law. In *In re Wood Family Interests, Ltd.,* 135 B.R. 407 (Bankr.D.Colo.1989), a creditor objected to a debtor's planned bankruptcy reorganization and argued that the 24% default interest rate to which the parties had agreed was enforceable. *Id.* at 409. The bankruptcy court agreed and, citing *McKay* and section 5–12–103, stated that the 24% rate was "within reason and . . . not usurious in Colorado." *Id.*

When these decisions are considered in conjunction with the statutory language of the current usury statute, it is clear that default interest is enforceable as interest on a nonconsumer loan under Colorado law. In this case, the parties entered into a contingency agreement as part of the loan to impose additional charges upon a late payment of either interest or principal. Because the numerical late charges are easily convertible to a percentage of the unpaid balance of the loan, and the late charges were a condition of the credit being extended, we find that the charges are interest under the usury statute section 5–12–103.

The debtor, however, contends that *Concord Realty Co. v. Continental Funding Corp.,* 776 P.2d 1114 (Colo.1989), requires a different analysis and result. In *Concord,* we reversed a finding of fraud in a complicated nonconsumer loan involving two promissory notes secured by a wrap-around deed of trust. The finding of fraud was based in part on expert testimony that the effective interest rate of the loan was 46%. We held that the expert's testimony was incompetent to establish the effective interest rate because it improperly characterized certain charges as interest when the items should have been treated as principal. *Id.* at 1121–23.

The *Concord* opinion noted that the definition of "interest" in the nonconsumer usury statute at section 5–12–103(2) is in part the same as the definition of "loan finance charge" for consumer loans at section 5–3–109(1), which is part of the Colorado version of the Uniform Consumer Credit Code (U.C.C.C.). *Concord,* 776 P.2d at 1120. For ease of comparison, we repeat the language of the usury statute section 5–12–103 which defines "interest" as

> the sum of all charges payable directly or indirectly by a debtor and imposed directly or indirectly by a lender as an incident to or as a condition of the extension of credit to the debtor, whether paid or payable by the debtor, the lender, or any other person on behalf of the debtor to the lender or to a third party.

§ 5–12–103(2), 2 C.R.S. (1992). Using in part the same language in its definition of "loan finance charge," the U.C.C.C. section 5–3–109 provides:

> "Loan finance charge" means the sum of all charges payable directly or indirectly by a debtor and imposed directly or indirectly by a lender as an incident to or as a condition of the extension of credit to the debtor, whether paid or payable by the debtor, the lender, or any other person on behalf of the debtor to the lender or to a third party, including any of the following types of charges which are applicable: Interest or any amount payable under a point, discount, or other system of charges, however denominated, premium, or other charge for any guarantee or insurance protecting the lender against the debtor's default or other credit loss; and charges incurred for investigating the collateral or credit-worthiness of the debtor or for commissions or brokerage of obtaining the credit. The term does not include charges as a result of default, additional charges (section 5–3–202), delinquency charges (section 5–3–203), or deferral charges (section 5–3–204).

§ 5–3–109(1), 2 C.R.S. (1992). In *Concord,* we looked to the specific examples of loan

finance charges in the U.C.C.C. statute as a guide to determine whether the disputed charges came within the nonconsumer loan definition of "interest." On this basis, we concluded that origination fees were included in the nonconsumer definition of "interest," and that closing costs in a real estate transaction, such as appraisal fees, inspection fees, credit reports and legal fees, were better characterized as principal. *Concord,* 776 P.2d at 1120–22; *see also* § 5–3–202(3), 2 C.R.S. (1992) (describing "additional charges"); § 5–3–107(3)(c)(II) (including "additional charges" as "principal").

The debtor argues that we should utilize the same reasoning here. Because the consumer loan definition of "loan finance charge" specifically excludes "charges as a result of default," the debtor contends that the analysis applied in *Concord* requires that default charges are necessarily excluded from interest in the nonconsumer loan context. We disagree.

*Concord* did not discuss late charges and made only a passing reference to the default of the loan at issue resulting in "the accrual of additional interest." *Concord,* 776 P.2d at 1120. Moreover, *Concord* was decided before *Copeland, Stoorman,* and the related cases and did not have the benefit of the historical definition of interest discussed in those cases. *Concord* is not dispositive and the question is whether its reasoning should be extended to cover the case now before us. For reasons discussed below, we decline to so extend *Concord.*

The *Concord* decision discussed the distinction between interest and principal under the usury statute section 5–12–103(2). In determining what constituted interest, we used the examples in the U.C.C.C. because of the similarity of the definition of "interest" and "loan finance charge." We included the additional charges in principal because the U.C.C.C. draws that distinction. The present case, however, requires us to distinguish between interest and a penalty, and the U.C.C.C. provides no useful guidance in making that distinction.

■ The fact that the legislature specifically excluded default charges from the U.C.C.C. definition of "loan finance charge" does not persuade us that the legislature intended to exclude late charges from the usury definition of "interest," i.e., charges imposed "as an incident to or as a condition of the extension of credit." § 5–12–103(2), 2 C.R.S. (1992). On the contrary, we find that the legislature excepted late charges from the general definition of "loan finance charge" for the purpose of providing specially tailored provisions for such charges in the context of consumer loans.[3] In contrast, the legislature did not except default or delinquency charges from the usury definition of "interest" or enact special late charge provisions in the nonconsumer loan context. This distinction in the two statutory schemes indicates that the legislature intended to regulate default charges under the general usury interest provision found at section 5–12–103.[4] As previously noted, this conclusion is consis-

---

**3.** In the consumer loan context, an example of those special provisions is found at § 5–3–203, 2 C.R.S. (1992), which provides the enforceable rates and the procedures necessary for a consumer loan creditor to collect a "delinquency charge."

**4.** Section 5–1–101, 2 C.R.S. (1992), specifically states that the U.C.C.C. comprises only articles 1 through 9 of title 5. While article 12 is certainly related to the U.C.C.C., in the sense that it applies to credit transactions, it is clearly a separate piece of legislation applicable only to nonconsumer transactions. In fact, the current version of the U.C.C.C., including § 5–3–109, was enacted in 1971. Ch. 207, sec. 1, §§ 73–1–101 to –6–402, 1971 Colo. Sess. Laws 770, 770–850.

In contrast, the 45% ceiling on interest in the nonconsumer loan context was enacted in 1972. Ch. 50, sec. 6, § 73–12–103, 1972 Colo. Sess. Laws 286, 292. Thus, when the legislature amended the usury law in 1972, it had before it the U.C.C.C. which it adopted in 1971. In general, an exception not expressly made by the legislature should not be read into a statute by the courts. *Karoly v. Industrial Comm'n of Colo.,* 65 Colo. 239, 245, 176 P. 284, 286 (1918). Accordingly, if the General Assembly intended to exclude late charges from interest in § 5–12–103 it could have specifically done so. *See City & County of Denver v. Rinker,* 148 Colo. 441, 446, 366 P.2d 548, 550 (1961)("[T]here is a presumption that all laws are passed with the knowledge of those already existing."). We will

tent with Colorado case law enforcing reasonable default interest charges. *See McKay,* 27 Colo. at 54–55, 59 P. at 747; *see also Capek v. Monahan,* 117 Colo. 131, 184 P.2d 501, 502 (Colo.1947); *In re Wood,* 135 B.R. at 409.

The construction urged by the debtor fails to recognize the different purposes served by the two statutes. One of the express purposes of the U.C.C.C. is to "protect consumer buyers, lessees, and borrowers against unfair practices by some suppliers of consumer credit." § 5–1–102, 2 C.R.S. (1992). The statute is designed to protect a typically unsophisticated borrower from a generally sophisticated lender. Therefore, the U.C.C.C. expressly limits the types of charges and rates that can be imposed on a borrower by a lender. *See* §§ 5–3–101 to –603, 2 C.R.S. (1992). The usury statute, on the other hand, applies to extensions of credit not already covered by articles 1 through 9. The usury statute sets a presumptive ceiling of 45% and applies only to nonconsumer loans. § 5–12–103, 2 C.R.S. (1992).

The debtor here was not in a position analogous to an unsophisticated borrower. Rather, the parties in this case were on relatively equal footing in terms of financial acumen and we give effect to the fact that the parties agreed to these late charges both initially and after the note was modified. Moreover, the distinct differences between the consumer loan and nonconsumer loan settings convince us that there is no policy benefit in applying the protections of the U.C.C.C. to the usury statute section 5–12–103 with respect to late charges. Thus, we refuse to do so.

In light of Colorado case law and the broad statutory definition of "interest" in the usury statute section 5–12–103, we hold that the late charges in this case are properly categorized as interest. Unlike the definition of "loan finance charge" for consumer loans, the nonconsumer usury statute does not exclude late charges from its definition of "interest." Further, the fixed late charge in this case is easily convertible to a percentage of the unpaid balance. The late charge in this case is essentially default interest and the effective rate of the charge must be analyzed to determine if it is usurious.

### IV.

■ Having concluded that the fixed late charges in this case are essentially default interest and are statutorily included in the definition of "interest" under the usury statute section 5–12–103(2), we now must determine whether the applied rate was usurious. The debtor contends that treating the late charges in this case as default interest is contrary to the computation provision of the usury statute. The debtor points out that the usury statute requires that the terms of the loan be analyzed from its inception to determine if the rate is usurious. The debtor argues that since it can not be determined at the inception of the loan whether the total interest rate is less than the 45% maximum rate of the usury statute, the late charges must be analyzed as penalties.[5]

With respect to rate computation, the usury statute specifically states:

The rate of interest shall be deemed to be excessive of the limit under this section only if it could have been determined at the time of the stipulation by mathematical computation that such rate would exceed an annual rate of forty-five percent when the rate of interest was calculated on the unpaid balances of the debt on the assumption that the debt is to be paid according to

not read in an exception that the General Assembly chose not to include.

**5.** The debtor contended at oral argument that the test for the enforceability of a late charge penalty is whether the charge is reasonable in light of the intentions of the parties. The debtor argued that applying commercial lending rates would be an appropriate measure of what is reasonable. We are not persuaded that determining the reasonableness of a penalty is any different from determining the reasonableness of interest. Further, applying commercial lending rates to this nonconsumer loan defeats the apparent legislative purpose of allowing parties to contract for an interest rate up to 45% under the usury statute.

its terms and will not be paid before the end of the agreed term.

§ 5–12–103(1), 2 C.R.S. (1992). Relying again on *Concord,* the debtor contends that since default interest or late charges are applied only if a loan is not paid off according to its terms, it is impossible to determine if the charges are unenforceable under the statute. We disagree.

The rate computation provision must be understood in context. Prior to 1972, the nonconsumer usury statute simply stated that parties could stipulate to an interest rate higher than 6%.1963 C.R.S. § 73–12–3. In 1972, the legislature amended the criminal code by adding a new article entitled "Offenses in the Making, Financing, or Collection of Loans." *See* Ch. 50, sec. 3, § 40–15–101 to –108, 1972 Colo. Sess. Laws 286, 288–291. As part of that Act, the legislature statutorily defined the crime of engaging in criminal usury and provided that a person was guilty of criminal usury if he or she "knowingly charges, takes, or receives any money or other property as a loan finance charge where the charge exceeds an annual percentage rate of 45 percent." § 40–15–104, 17 C.R.S. (1973). Under the same statute, it was an affirmative defense to the crime of criminal usury if:

> [A]t the time of making said loan finance charge it could not have been determined by a mathematical computation that the annual percentage rate would exceed an annual percentage rate of forty-five percent;
>
> [or]
>
> [T]he loan finance charge was not in excess of an annual percentage rate of forty-five percent when the rate of the finance charge was calculated on the unpaid balance of the debt on the assumption that the debt is to be paid according to its terms and is not paid before the end of the agreed term.

§ 40–15–104(2)(a) & (b), 17 C.R.S. (1973).

The same act also amended the usury statute now codified at section 5–12–103. *See* Ch. 50, sec. 6, § 73–12–103, 1972 Colo. Sess. Laws 286, 292 (now codified at § 5–12–103, 2 C.R.S. (1992)). In order to be consistent with the criminal code, the legislature applied the same 45% ceiling to the usury statute applicable in this case. It also added the above quoted affirmative defense mens rea language to the computation provision of the usury statute without changing the definition of "interest." Interpreted literally, the computation provision would require a finding that default interest can never be usurious because the effective rate of interest cannot be computed at the loan's inception. Surely it cannot have been the legislature's intent to so limit the usury statute.

■ The rules of statutory construction require us to give effect to each and every word enacted by the legislature unless to do so would cause an absurd result. *Conte v. Meyer,* 882 P.2d 962, 965 (Colo.1994); *Snyder Oil Co. v. Embree,* 862 P.2d 259, 262 (Colo.1993). This is one of those rare cases when we can not apply the statutory language as written for default interest. We reach this conclusion for two reasons. First, as discussed above, Colorado case law indicates that reasonable default interest is legal and enforceable. *See Capek v. Monahan,* 117 Colo. 131, 184 P.2d 501, 502 (Colo.1947); *McKay,* 27 Colo. at 54–55, 59 P. at 747; *In re Wood,* 135 B.R. at 409. These cases concerned the reasonableness of a default rate of interest and were based on the usury statutes in effect at that time. More importantly, these cases accepted that penalties were unenforceable, but concluded that the rates involved were reasonable and therefore not penalties under Colorado law. *McKay,* 27 Colo. at 54–55, 59 P. at 747; *In re Wood,* 135 B.R. at 409–10; *but see Browne v. Steck,* 2 Colo. 70, 78 (1873)(effective interest rate of 120% is a penalty because it does not bear a reasonable relationship with the value of money). A literal reading of the computation provision would leave us with no legislative guidance to determine when a default interest rate was reasonable.

Second, when an effective interest rate is retrospectively computed after all forms of

interest charges have been assessed, and the rate is determined to be under 45%, it stands to reason that the creditor did not intend to collect a higher rate of interest at the loan's inception. Since the legislature's intent was to avoid imposing criminal liability on a creditor who lacked intent to charge interest at a rate higher than 45%, the fact that such a rate was not charged shows that the loan was not usurious and the creditor's original intent is irrelevant. Only if the effective interest rate actually exceeded 45% would the question arise whether the creditor intended to commit usury.

■ Clearly, the legislature has concluded that, absent specific statutory provisions to the contrary, an applied rate of interest that is under 45% is reasonable. We are not persuaded that the analysis should be changed simply because the interest rate only approaches the 45% ceiling in the event of a late payment. Therefore, we hold that for nonconsumer loans a default interest rate is also reasonable and enforceable so long as the applied per annum rate, when added to the initial rate charged on the outstanding principal, is less than 45% of the unpaid principal balance at the time of the default.

In this case, the parties agreed to impose additional charges upon a late payment of either interest or principal. Although, the parties agreed that the daily charge was $700 per day, the creditor seeks an applied rate of only $413.33 per day. These late charges easily are convertible to a percentage of the unpaid balance of the loan. At the time of the default the unpaid balance of the loan was $472,764.45. Therefore, the default interest rate is 31.9% which, when added to the initial rate of 13%, results in an effective rate of 44.9%. Because that rate is not usurious under section 5–12–103, it is a reasonable and enforceable rate of interest.

## V.

Accordingly, we reverse the judgment of the court of appeals and return the case to the court of appeals with directions to re-mand the case to the trial court for further proceedings consistent with this opinion.

VOLLACK, C.J., dissents, and LOHR, J., joins in the dissent.

SCOTT, J., does not participate.

Chief Justice VOLLACK dissenting:

The majority holds that "the late charges in this case are properly characterized as 'default interest' and are reasonable as analyzed under the nonconsumer loan usury statute." Maj. op. at 1287. Contrary to the majority's conclusion, I believe that the late charges in this case do not constitute interest but instead constitute an unenforceable penalty. I therefore dissent.

### I.

The majority holds that the late charges in the case before us constitute "interest" pursuant to section 5–12–103(2), 2 C.R.S. (1992). Section 5–12–103(2) defines the term "interest" as follows:

[T]he sum of all charges payable directly or indirectly by a debtor and imposed directly or indirectly by a lender as an incident to or as a condition of the extension of credit to the debtor, whether paid or payable by the debtor, the lender, or any other person on behalf of the debtor to the lender or to a third party.

*Id.* Although this court has not yet considered whether late charges constitute "interest" as defined by section 5–12–103(2), we have considered whether other types of charges constitute interest pursuant to this statutory definition. *Concord Realty Co. v. Continental Funding Corp.,* 776 P.2d 1114 (Colo.1989). In *Concord Realty,* we noted that section 5–12–103(2) uses a definition of "interest" in the non-consumer context which is identical to the definition of "loan finance charge" in the consumer context, found in section 5–3–109(1), 2 C.R.S. (1992). *Concord Realty,* 776 P.2d at 1121. Additionally, we noted in *Concord Realty* that section 5–3–

109(1) specifically excludes certain charges from its definition of "loan finance charge." Due to the parallel definitions in both statutory provisions, we looked to the exclusions found in section 5–3–109(1) to determine whether certain charges constituted "interest" pursuant to section 5–12–103(2). *Concord Realty*, 776 P.2d at 1121.[1]

In accordance with our analysis in *Concord Realty*, it is appropriate to turn to section 5–3–109(1) in the present case to determine whether late charges constitute "interest" pursuant to section 5–12–103(2). Section 5–3–109(1) provides:

> "Loan finance charge" means the sum of all charges payable directly or indirectly by the debtor and imposed directly or indirectly by the lender as an incident to or as a condition of the extension of credit, whether paid or payable by the debtor, the lender, or any other person on behalf of the debtor to the lender or to a third party. . . . *The term does not include charges as a result of default,* additional charges (section 5–3–202), delinquency charges (section 5–3–203), or deferral charges (section 5–3–204).

(Emphasis added.) As noted earlier, the definition of "loan finance charge" contained in section 5–3–109(1) is identical to the definition of "interest" contained in section 5–12–103(2). Furthermore, section 5–3–109(1) specifically states that default charges do not constitute "loan finance charges." Because default charges are essentially the same as late charges, it follows that late charges therefore do not constitute "interest" pursuant to section 5–12–103(2).

The majority declines to follow the *Concord Realty* analysis because that case determined whether certain charges constituted interest or principal, whereas the current case requires us to determine whether a late charge constitutes interest or a penalty. In my view, this distinction between principal and penalty is irrelevant because the pivotal

issue in both *Concord Realty* and the current case is whether certain charges constitute "interest" as defined by section 5–12–103(2).

The majority also states that "the distinct differences between the consumer loan and nonconsumer loan settings convince us that there is no policy benefit in applying the protections of the U.C.C.C. [section 5–3–109(1) ] to the usury statute section 5–12–103 with respect to late charges." Maj. op. at 1293. Such a statement is directly contrary to this court's holding in *Concord Realty* that the U.C.C.C. is to be used as a guide in nonconsumer transactions "because the history and language of the statutes make it apparent that the General Assembly intended to create a comprehensive scheme to regulate the extension of credit." *Concord Realty*, 776 P.2d at 1121.

Additionally, the majority declines to follow *Concord Realty* because that case preceded the cases on which the majority relies, such as *Copeland v. MBNA America Bank, N.A.,* 907 P.2d 87 (Colo.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2496, 135 L.Ed.2d 189 (1996), and *Stoorman v. Greenwood Trust Co.,* 908 P.2d 133 (Colo.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 2498, 135 L.Ed.2d 190 (1996). However, the cases on which the majority relies are inapplicable to the current case because they address whether late charges constitute "interest" pursuant to entirely different federal statutes, such as the National Banking Act and the Depository Institutions Deregulation and Monetary Control Act. In contrast, *Concord Realty* is applicable because it addresses the identical issue as the one now before this court: whether certain charges constitute "interest" pursuant to section 5–12–103(2) of the Colorado statutes. Thus, I believe that our analysis in *Concord Realty* is dispositive, and as discussed above, that analysis leads me to conclude that late charges do not constitute "interest" pursuant to section 5–12–103(2).

## II.

The majority also applies section 5–12–103(1), 2 C.R.S. (1992), to the late charges in

---

**1.** This court concluded in *Concord Realty* that an origination fee constituted interest, but an appraisal fee, inspection fee, credit reports, Federal Express charges, and legal fees at closing did not constitute interest. *Concord Realty,* 776 P.2d at 1121–22.

the current case and holds that the late charges are enforceable because they mathematically conform to the statutory limits. I disagree. In addition to my view that section 5–12–103(2) does not apply to late charges because such charges do not constitute interest, I also believe that section 5–12–103(1) does not apply to late charges because such charges cannot be determined to be usurious at the time an agreement is made.

Section 5–12–103(1) provides, in pertinent part:

The rate of interest shall be deemed to be excessive of the limit under this section *only if it could have been determined at the time of the stipulation* by mathematical computation that such rate would exceed an annual rate of forty-five percent when the rate of interest was calculated on the unpaid balances of the debt on the assumption that the debt is to be paid according to its terms and will not be paid before the end of the agreed term.

(Emphasis added.) As this section makes clear, the calculation for usury only applies to interest, and the usurious nature of the interest must be capable of being determined at the time the agreement is made. *Id.*

Late charges are applied only if a loan is not paid according to its terms. Consequently, it is not possible to determine whether late charges are enforceable at the inception of the loan as required by the usury statute. In my view, therefore, the usury statute's mathematical limit on interest rates does not apply to late charges.

### III.

Having concluded that late charges do not constitute "interest" and that section 5–12–103(1) does not apply to late charges because they cannot be determined as usurious at the inception of the loan agreement, it is now necessary to determine whether such late charges constitute an unenforceable penalty.

It has long been established in Colorado that an additional default charge is unen-forceable if it constitutes a penalty imposed for the purpose of enforcing prompt payment. *McKay v. Belknap Savings Bank,* 27 Colo. 50, 54, 59 P. 745, 747 (1899). Late charges are usually imposed for failure to pay periodic smaller installments. A fixed daily late charge applies to any failure to pay an amount due in full; it is unrelated to any particular amount unpaid. As such, a fixed daily late charge can amount to an extremely high rate per annum even for minor delinquencies in time and amount, and it becomes even more oppressive when the principal balance is reduced by any scheduled or unscheduled payment.

In the current case, after the debtor made payments reducing the principal, the amount of the debt was $472,764.45. Consequently, the $700 daily late charge, when added to the interest rate of 13%, exceeded 67% per annum. The creditor later unilaterally reduced the late charge fee to $413.33 per day. When the reduced late charge was added to the 13% interest rate, the total was 44.99% per annum. In my view, this extremely high late charge is unreasonable and punitive in character. Such a late charge is an attempt to coerce timely payment and is not reasonably calculated to merely compensate the injured lender. I therefore believe that the late charge in this case was a penalty and should not be enforceable.

### IV.

I believe that late charges do not constitute "interest" pursuant to section 5–12–103(2). I also believe that, in this case, the late charges constituted an unenforceable penalty. I therefore dissent.

I am authorized to say that Justice LOHR joins in this dissent.