**Brian K. COPELAND, on behalf of himself and all others similarly situated, Petitioner,**

v.

**MBNA AMERICA BANK, N.A., Respondent.**

**No. 94SC409.**

Supreme Court of Colorado,
En Banc.

Nov. 20, 1995.

Bader & Villanueva, P.C., Gerald L. Bader, Jr., Jeffrey M. Villanueva, Renee B. Taylor, Denver, Chimicles, Jacobsen & Tikellis, Michael D. Donovan, Haverford, Pennsylvania, for Petitioner.

Ireland, Stapleton, Pryor & Pascoe, P.C., D. Monte Pascoe, Scot M. Peterson, Denver, Sullivan & Cromwell, John L. Warden, Richard J. Urowsky, Lori S. Sherman, New York City, for Respondent.

James K. Kreutz & Associates, P.C., James K. Kreutz, Englewood, for Amici Curiae Consumer Action, States of Hawaii, Iowa, Maryland, Massachusetts, Pennsylvania, Vermont and Wisconsin; Trial Lawyers for Public Justice, P.C.; and Bankcard Holders of America, Inc.

Gale A. Norton, Attorney General, Stephen K. ErkenBrack, Chief Deputy Attorney General, Timothy M. Tymkovich, Solicitor General, Denver, for Amicus Curiae State of Colorado.

McKenna & Cuneo, Daniel S. Hoffman, I. Thomas Bieging, Denver, for Amici Curiae States of Arizona, Delaware, Louisiana, Nevada, Ohio, South Dakota and Utah.

Davis, Graham & Stubbs, William A. Bianco, Denver, Wilmer, Cutler & Pickering, Ronald J. Greene, Christopher R. Lipsett, Charles A. Mendels, Craig M. Blackwell, Washington, DC, for Amicus Curiae Citibank (SD), N.A.

Dean S. Neuwirth, Denver, for Amici Curiae MasterCard Int'l, Inc. and VISA U.S.A., Inc.

Fairfield & Woods, P.C., Jac K. Sperling, Craig A. Umbaugh, Denver, for Amici Curiae Colorado Bankers Ass'n., American Bankers Ass'n., American Financial Servs. Ass'n. and Consumer Bankers Ass'n.

United States Attorney's Office, Linda A. Surbaugh, Denver, Office of the Comptroller of the Currency, L. Robert Griffin, Horace G. Sneed, Washington, DC, for Amicus Curiae Office of the Comptroller of the Currency.

Justice MULLARKEY delivered the Opinion of the Court.

We granted certiorari to review the court of appeals' decision in *Copeland v. MBNA Am., N.A.*, 883 P.2d 564 (Colo.App.1994).[1] The court of appeals held that section 85 of the National Bank Act, 12 U.S.C. § 85 (1982), preempted a Colorado consumer protection law, thereby, allowing a national banking association, located in Delaware, to charge a Colorado credit cardmember "interest" in the form of a "late payment fee." We affirm the judgment of the court of appeals, but we base our decision on different grounds.

## I.

Respondent, MBNA America Bank, N.A. (MBNA), is a national banking association chartered by the United States Office of the Comptroller of the Currency (OCC) and governed by the National Bank Act (NBA), 12 U.S.C. § 85 (1982). The NBA requires MBNA to file an organization certificate. MBNA's organization certificate lists Delaware as "[t]he place where its operations of discount and deposit are to be carried

---

1. We granted certiorari on the following three issues:

   1. Does the term "interest" in section 85 include contingent penalty charges (late fees), which were not considered "interest" at common law, so as to preempt Colorado's prohibition and regulation of such charges on revolving credit accounts?

2. Did Congress intend for Delaware's legislative definition of "interest rate" to displace Colorado's consumer protection and common law prohibiting late fees on revolving credit accounts?
3. Could Congress constitutionally delegate to Delaware the power to define the federal lending term "interest" for all fifty states, including Colorado, so as to preempt other states' laws?

on . . . .," 12 U.S.C. § 22 (1989), and its state of incorporation.

MBNA issues credit cards under the VISA and MasterCard service marks. The credit cards permit MBNA to lend money on an open-end credit basis to borrowers throughout the United States. The terms and conditions governing the use of its credit cards are set forth in a cardmember agreement (Agreement). The Agreement provides that a cardmember must make a specified minimum monthly payment on the account's outstanding balance, and failure to do so by the due date constitutes default. The Agreement further provides for the imposition of a fifteen dollar late payment fee [2] if the specified minimum payment is not paid within twenty-five days of the due date. MBNA does not include late payment fees in the computation of its annual percentage rate, and separately identifies finance charges and late payment fees on the monthly billing statement.

Petitioner, Brian K. Copeland (Copeland), a Colorado resident, became a MBNA VISA cardmember in 1988. Copeland used his VISA credit card to purchase goods and services in Colorado. In March 1992, Copeland failed to pay his VISA minimum monthly payment, and MBNA assessed a fifteen dollar late payment fee to his VISA credit card account.

Copeland initiated this class action, on behalf of himself and all others similarly situated, seeking injunctive relief and damages under Colorado statutory and common law. Specifically, Copeland alleges that MBNA violated section 5–3–203 of the Colorado Uniform Consumer Credit Code (UCCC), § 5–3–

203, 2 C.R.S. (1992), by imposing a late payment fee in addition to a finance charge on his VISA credit card account. Copeland contends that the UCCC prohibits banking associations, both state and national, from charging a late payment fee to the credit card account of a Colorado resident.

In response, MBNA asserts that section 85 of the NBA, 12 U.S.C. § 85 (1982), preempts section 5–3–203 of the UCCC, § 5–3–203, 2 C.R.S. (1992).[3] MBNA maintains that the NBA allows national banks to assess "interest" in the form of a late payment fee if allowed by the state listed in the national bank's organization certificate. Because the Delaware Banking Statute (Delaware Statute), Del.Cod.Ann. tit. 5, § 950 (1993), has defined a late payment fee as a form of "interest," MBNA asserts that, as a national bank located in Delaware, it can charge "interest" in the form of a late payment fee to a Colorado resident.[4]

The district court granted MBNA's motion for judgment on the pleadings and dismissed the complaint. The court of appeals affirmed the dismissal, and we granted certiorari. We conclude that, as a matter of federal law, the fifteen dollar late payment fee imposed on Copeland's VISA credit card account is a form of "interest" under section 85 of the NBA. Because MBNA is a national bank located in Delaware, and Delaware law permits the imposition of a late payment fee, MBNA can charge Copeland a late payment fee despite the fact that Colorado prohibited such fees.

## II.

In April 1992, the month MBNA charged a late payment fee to Copeland's VISA credit

2. Banking associations also refer to a late payment fee as a contingent penalty fee, delinquency charge, or non-periodic interest charge.

3. MBNA made an unsuccessful attempt to remove this case to federal court on federal question jurisdiction. *See Copeland v. MBNA Am., N.A.*, 820 F.Supp. 537 (D.Colo.1993).

4. Although Copeland and MBNA frame their arguments in terms of preemption, as is consistent with the wording of certiorari issues one and three, this case does not raise a preemption issue. In the NBA, Congress has chosen to define the federal law by incorporating state law, a frequently used technique. The NBA directs that

a nationally chartered bank may charge interest on loans as permitted by the bank's home state. The incorporation here of Delaware law has an incidental effect on enforcement of a provision of the Colorado UCCC when a Colorado resident, such as Copeland, chooses to obtain a loan from MBNA. That fact, however, does not amount to a showing of preemptive effect. Congress has limited its regulation in the NBA to nationally chartered banks and has made no attempt either to interfere with Colorado's regulation of state chartered banks or to occupy the field of consumer loans. The second certiorari issue is dispositive of this case.

card account, section 5–3–203 of the UCCC prohibited banks from assessing late payment fees on revolving credit accounts, such as VISA credit cards. The UCCC provided, in relevant part:

> (5)(a) Except as provided in paragraph (b) of this section (5), with respect to a consumer loan, refinancing, or consolidation which is not pre-computed, including a revolving loan account, the parties *may contract for a delinquency charge* on any installment not paid in full within ten days after its scheduled due date in an amount not exceeding the lesser of five percent of the unpaid amount of the installment or ten dollars; *except that the provisions of this paragraph (a) shall not apply to a revolving loan account for which a lender credit card is issued by the lender to the debtor.*

§ 5–3–203, 2 C.R.S. (1992) (emphasis added).[5]

Unlike Colorado, at the time this case arose, Delaware statutorily allowed its banks to charge late payment fees at the rate of fifteen dollars per billing cycle. Section 950 of the Delaware Statute provides:

> If the agreement governing a revolving credit plan so provides, *a bank may impose, as interest, a late or delinquency charge* upon any outstanding unpaid installment payments or portions thereof under the plan which are in default.... No delinquency charge shall exceed fifteen dollars.

Del.Cod.Ann. tit. 5, § 950 (1993) (emphasis added).

However, MBNA's banking activities are governed by the NBA, which provides in section 85:

> *Any association [national bank] may take, receive, reserve, and charge* on any loan or discount made, or upon any notes, bills of exchange, or other evidence of debt, *interest at the rate allowed by the laws of the State ... where the bank is located.*

12 U.S.C. § 85 (1982) (emphasis added).

### III.

We must decide if late payment fees are a form of "interest" under section 85 of the NBA. To answer that question, we turn to the well-established rules of federal statutory interpretation. First, we look at the statutory language itself. *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). Where the statutory language is clear and certain, the statute should be construed as written, because the function of the court, in such a case, is to enforce the statute according to its terms. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). Where, however, the statutory language is ambiguous or unclear, resort to legislative history is appropriate in order to arrive at an interpretation that effectuates legislative intent. *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547–48, 79 L.Ed.2d 891 (1984). Moreover, wherever practicable a statute should be interpreted in a manner that gives effect to all its provisions and policy objectives, and not in a way that renders one or more of its parts or goals inoperative. *Mountain States Tel. and Tel. Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 249, 105 S.Ct. 2587, 2594, 86 L.Ed.2d 168 (1985).

Section 85 of the NBA does not provide a definition for the term "interest" or "interest at the rate." 12 U.S.C. § 85 (1982). Copeland suggests that the term "interest" should be defined narrowly only to include numerical periodic percentage interest rates. Copeland argues that at common law the term "interest" did not include penalty fees and that a late payment fee is a penalty fee.

---

5. In 1993, the Colorado General Assembly amended section 5–3–203 of the UCCC to allow banks to impose a late payment fee on credit card accounts in Colorado. The amended section provides, in part:

> The parties to a revolving loan account for which a lender credit card is issued which is not secured by an interest in land *may contract to impose a delinquency charge* on any mini-mum payment due in connection with a billing cycle that remains unpaid ten days after such minimum payment's scheduled due date.... No delinquency charge shall exceed fifteen dollars.

§ 5–3–203, 2 C.R.S. (1995 Supp.) (emphasis added). However, this amendment does not apply to the case before us.

In support, Copeland refers to Webster's International Dictionary, which defines "interest" as "the price paid for borrowing money generally expressed as a percentage of the amount borrowed in one year." *Webster's Third New International Dictionary*, 1104 (3rd ed. 1986).

On the other hand, MBNA suggests that we define the term "interest" broadly to include a wide variety of banking fees, including late payment fees. MBNA argues that historically the term "interest" included penalty fees. In support, MBNA refers to the Oxford English Dictionary, which defines "interest" as the "amount paid as a penalty for failure to repay a sum of money on time." *Oxford English Dictionary*, 739 (10th ed.1990). MBNA contends that Copeland's use of the term "interest" as a numerical periodic percentage rate does not accurately reflect the historical use of the term. We conclude that the common dictionary definitions are not sufficiently precise to settle the question before us.

Given that the statutory language is not clear with respect to whether a late payment fee is a form of "interest," we next look to the legislative history of the NBA. The Civil War Congress enacted the NBA in 1864. Until the enactment of the NBA, state regulations had controlled the nation's banking industry. The goal of the NBA was to create a centralized federal national banking system which would facilitate interstate commerce by issuing a reliable form of currency.[6] *Veazie Bank v. Fenno*, 75 U.S. (8 Wall.) 533, 536–39, 19 L.Ed. 482 (1869). The purpose of enacting the NBA was to allow the federal government to raise funds for the Union's war efforts. *See* Cong.Globe, 38th Cong., 1st Sess. 1257 (1864) (remarks of Representative Hooper) ("[T]he national bank act ... [was] recommended by the Secretary of the Treasury as [a measure] to be relied upon to carry the nation through the financial difficulties of this war.").

Since the legislative history does not directly address whether late payment fees are a form of "interest," we look to court interpretation of section 85 of the NBA. The United States Supreme Court first construed section 85 of the NBA in *Tiffany v. National Bank*, 85 U.S. (18 Wall.) 409, 21 L.Ed. 862 (1873). There, the court announced what became known as the "most favored lender" doctrine. The court reasoned that in order to create a centralized federal national banking system, Congress needed to protect the newly created national banks from unfair treatment by state legislatures. Hence, section 85 of the NBA allowed a national bank to charge interest on a loan at the same rate allowed to state regulated lenders in the national bank's home state. *Id.* In *Tiffany*, the Court allowed a national bank located in Missouri to charge the same interest rates chargeable by natural persons under Missouri law. *Id.* *See Fisher v. First Nat'l Bank*, 548 F.2d 255, 258 (8th Cir.1977) ("[S]ection 85 was designed by Congress to place national banks on a plane of at least competitive equality with other lenders in the respective states, and indeed, to give to national banks a possible advantage over state banks in the field of interest rates.").

The United States Supreme Court continued its interpretation of section 85 of the NBA in *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978). There, the court announced what became known as the "exportation principle." The court reasoned that in order to give national banks a competitive advantage over state banks, national banks were allowed to charge borrowers in another state the interest rate set by their home state. *Id.* In *Marquette*, the court held that a national bank chartered in Nebraska could charge its Minnesota credit card customers an interest rate that was allowed under Nebraska law, but was higher than the rate allowed by Minnesota usury laws. *Id.*

---

**6.** Congress previously attempted to create a national banking system with the establishment of the First and Second Banks of the United States in 1791 and 1816, respectively. However, the two banks were short lived, falling victim to the ongoing political struggle between advocates of a strong central government and advocates of "state rights." President Madison permitted the First Bank's charter to expire in 1811. President Jackson vetoed the Second Bank's re-charter in 1832. *Tiffany v. National Bank*, 85 U.S. (18 Wall.) 409, 21 L.Ed. 862 (1873).

Over the years, courts faced with interpreting section 85 of the NBA uniformly have taken an expansive view of the term "interest." These courts have included numerous banking charges other than numerical periodic percentage interest rates as a form of "interest." As the banking industry evolved, the term "interest" was defined to include banking charges related to loans, mortgages, and credit cards and has specifically included overdraft charges, transaction fees, and annual fees. *See Citizens' Nat'l Bank v. Donnell,* 195 U.S. 369, 373–74, 25 S.Ct. 49, 49–50, 49 L.Ed. 238 (1904) (overdraft charge); *American Timber & Trading Co. v. First Nat'l Bank,* 690 F.2d 781, 790 (9th Cir.1982) (compensating balance requirement); *Fisher v. First Nat'l Bank,* 548 F.2d 255, 258–61 (8th Cir.1977) (cash advance fee); *Northway Lanes v. Hackley Union Nat'l Bank & Trust Co.,* 464 F.2d 855, 863 (6th Cir.1972) (closing costs); *Northampton Nat'l Bank v. Attorney General,* 8 Mass.App. Ct. 809, 397 N.E.2d 1149 (1979) (annual fee).

## IV.

From the above examination, it is apparent that a national bank can charge a variety of banking fees, as forms of "interest," to credit cardholders in other states if allowed by the national bank's home state. We are persuaded for the following reasons that late payment fees are a form of "interest" under section 85 of the NBA.

First, contrary to Copeland's theory, there is sufficient authority to allow us to conclude that a form of late payment fees was included in the definition of the term "interest" at the time the NBA was enacted. *See, e.g., Library of Congress v. Shaw,* 478 U.S. 310, 315, 106 S.Ct. 2957, 2961–62, 92 L.Ed.2d 250 (1986) ("The institution of interest originated under Roman law as a penalty due from a debtor who delayed or defaulted in repayment of a loan."); *Shoemaker v. United States,* 147 U.S. 282, 321, 13 S.Ct. 361, 394, 37 L.Ed. 170 (1893) ("Interest includes damages, by reason of the failure of the debtor to pay the principal when due."); *United States v. North Carolina,* 136 U.S. 211, 216, 10 S.Ct. 920, 922, 34 L.Ed. 336 (1890) ("Interest . . . is allowed by the courts as damages for the detention of money . . . or of compensation, to which the [lender] is entitled."); *Redfield v. Ystalyfera Iron Co.,* 110 U.S. 174, 176, 3 S.Ct. 570, 572, 28 L.Ed. 109 (1884) ("Interest is given on money demands as damages for delay in payment, being just compensation to the plaintiff for a default on the part of his debtor."); *Brown v. Hiatts,* 82 U.S. (15 Wall.) 177, 185, 21 L.Ed. 128 (1872) ("Interest is the compensation allowed by law, or fixed by the parties, for the use or forbearance of money, or as damages for its detention.").

Second, we give deference to the various OCC administrative opinions and rulings interpreting late payment fees as a form of "interest" under section 85 of the NBA. 12 C.F.R. § 7.7378 (1971). The OCC, a branch of the United States Treasury Department, is responsible for administration of the NBA. The OCC has authorized national banks to engage in credit card programs as an exercise of the lending powers granted to them under the NBA which allows them to lend money on personal security. 12 U.S.C. § 24 (1989). The OCC consistently has taken the position that late payment fees are "interest" under both section 85 of the NBA and section 521 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDA), 12 U.S.C. § 1831d (1980).[7] Because the OCC is charged with administering the NBA, its opinions and rulings are entitled to substantial deference. *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 403, 107 S.Ct. 750, 759, 93 L.Ed.2d 757 (1987). Moreover, this deference is particularly appropriate because national banks have designed their interstate credit card programs under the OCC's guidance. *Independent Bankers Ass'n v. Marine Midland Bank, N.A.,* 757 F.2d 453, 461 (2d Cir.1985), *cert. denied,* 476 U.S. 1186, 106 S.Ct. 2926, 91 L.Ed.2d 554 (1986).

■ Third, we believe Congress' recent enactment of the DIDA, although certainly

---

7. Section 85 of the NBA governs federally-chartered and insured national banks and is administered by the OCC. Section 521 of the DIDA governs state-chartered banks and is administered by the Federal Depository Insurance Corporation (FDIC). *See* 12 C.F.R. § 7.7378.

not dispositive, lends support that late payment fees are a form of "interest" under section 85 of the NBA. In 1980, Congress enacted the DIDA to regulate FDIC insured state chartered banks. Congress incorporated the language of section 85 of the NBA into section 521 of the DIDA. Section 521 states in part:

In order to prevent discrimination against State-chartered insured depository institutions ... with respect to interest rates ... such State bank ... *may take, receive, reserve, and charge* on any loan or discount, or upon any note, bill of exchange, or other evidence of debt, *interest at a rate ... allowed by the laws of the State ... where the bank is located.*

12 U.S.C. § 1831d (1980) (emphasis added). Like the NBA, the term "interest" or "interest at a rate" is not defined in section 521 of the DIDA. Generally, similar language should be interpreted in the same manner, unless the context requires different interpretation. *Lorillard v. Pons,* 434 U.S. 575, 580–81, 98 S.Ct. 866, 869–70, 55 L.Ed.2d 40 (1978). Further, Congress is presumed to be aware of judicial interpretations of statutory language when it intentionally incorporates the language of one statute into another statute. *Id.* The language and legislative history of section 521 of the DIDA grants federally insured, state chartered banks the same interest authority as national banks. We believe that had Congress intended to define "interest" with a narrow definition of numerical periodic percentage rates, it would have provided that definition in section 521 of the DIDA. Because Congress did not act to the contrary of the vast majority of court decisions, we are persuaded that late payment fees are "interest" under section 85 of the NBA.

Finally, we are persuaded by the reasoning of the many courts that have interpreted late payment fees as a form of "interest." Prior to 1992, courts had not directly addressed the issue whether late payment fees were "interest" under section 85 of the NBA or section 521 of the DIDA. At present, the issue has been examined by several courts.[8] The overwhelming majority of the decisions concluded that late payment fees charged to credit card customers, like the charge in dispute here, are "interest" under section 85 of the NBA and section 521 of the DIDA which can be exported to other states by a national or FDIC insured state chartered bank. *See Greenwood Trust Co. v. Massachusetts,* 971 F.2d 818 (1st Cir.1992), *cert. denied,* 506 U.S. 1052, 113 S.Ct. 974, 122 L.Ed.2d 129 (1993); *Watson v. First Union Nat'l Bank,* 837 F.Supp. 146 (D.S.C.1993); *Goehl v. Mellon Bank,* 825 F.Supp. 1239 (E.D.Pa.1993); *Tikkanen v. Citibank (SD), N.A.,* 801 F.Supp. 270 (D.Minn.1992); *Hill v. Chemical Bank,* 799 F.Supp. 948 (D.Minn. 1992); *Nelson v. Citibank, N.A.,* 794 F.Supp. 312 (D.Minn.1992); *Smiley v. Citibank (SD), N.A.,* 11 Cal.4th 138, 44 Cal.Rptr.2d 441, 900 P.2d 690 (1994); *Sherman v. Citibank (SD), N.A.,* 272 N.J.Super. 435, 640 A.2d 325 (App. Div.1994) *cert. granted,* 138 N.J. 270, 649 A.2d 1289 (1994).

The United States Court of Appeals for the First Circuit was the first court to define late payment fees as a form of "interest." *Greenwood,* 971 F.2d at 831. There, the court of appeals reversed the district court and held that a Massachusetts statute prohibiting the imposition of late fees on credit card customers was preempted by the DIDA. In *Greenwood,* a national bank located in Delaware was allowed to charge late payment fees to Massachusetts residents. *Id.*

The Supreme Court of California was the first state supreme court to examine the issue. *Smiley,* 44 Cal.Rptr.2d at 443, 900 P.2d at 692. There, the court affirmed the court of appeals' decision holding that the term "interest" in section 85 of the NBA can be construed to cover late payment fees if such fees are allowed by the national bank's homestate. *Id.* In *Smiley,* a national bank located in South Dakota was allowed to charge a California resident a late payment fee as a form of "interest." *Id.*

To date, the only jurisdiction to conclude that the term "interest" does not include late

---

8. In these cases, customers have challenged various banking fees assessed by both national banks and FDIC insured state-chartered banks. The courts have decided whether various banking fees are forms of "interest" under both section 85 of the NBA and section 521 of the DIDA.

fees is the Superior Court of Pennsylvania. In two cases, *Mazaika v. Bank One*, 439 Pa.Super. 95, 653 A.2d 640 (1994), and *Gadon v. Chase Manhattan Bank*, 439 Pa.Super. 210, 653 A.2d 697 (1995), the court held that late fees, annual fees, check return charges, and over-credit-limit charges were subject to Pennsylvania's consumer protection and usury statutes in that the DIDA only preempted state law to the extent of its narrow definition of "interest" as an annual percentage rate. In light of our prior examination, we reject this court's interpretation of "interest."

### V.

■ We conclude that the NBA's purpose and legislative history compel a finding that late payment fees are a form of "interest" under section 85 of the National Bank Act. As such, MBNA is allowed to charge late payment fees to Colorado residents. Accordingly, we affirm the judgment of the court of appeals.

SCOTT, J., does not participate.