2012 COA 66

**GREAT PLAINS NATIONAL BANK, N.A., Plaintiff–Appellee,**

v.

**Jamie MOUNT, a/k/a Jack Mount, and Cattle Consultants, LLC, Defendants–Appellants.**

Nos. 11CA1243, 11CA1250.

Colorado Court of Appeals, Div. VI.

April 12, 2012.

Markus Williams Young & Zimmermann LLC, Steven R. Rider, Devi C. Yorty, Denver, Colorado, for Plaintiff–Appellee.

Houtchens, Houtchens & Greenfield, L.L.C., Brandon B. Houtchens, Greeley, Colorado, for Defendant–Appellant Jamie Mount.

Wyatt & Wyatt, LLC, Billy B. Wyatt, David R. Wyatt, Fort Collins, Colorado, for Defendant–Appellant Cattle Consultants, LLC.

Opinion by Judge LICHTENSTEIN.

¶ 1 In this consolidated appeal, defendants, Jamie Mount and Cattle Consultants, LLC (Cattle Consultants), appeal the district court's summary judgment in favor of plaintiff, Great Plains National Bank, N.A. (Great Plains), on their separate motions for summary judgment. We affirm.

## I. Background

¶ 2 This case involves two disputes: The first is between Mount and Great Plains, Mount claiming that, under the Food Security Act of 1985 (FSA), he purchased 206 head of cattle free of a security interest claimed by Great Plains. The second is between Cattle Consultants and Great Plains, each claiming a superior security interest in the 206 head of cattle.

¶ 3 *The Great Plains security interest.* In October 2009, Fred Smith, an Oklahoma cattleman, obtained a loan from Great Plains. In exchange, Smith granted Great Plains a security interest covering "[a]ll cattle" that he owned at the time or would acquire in the future. On November 19, 2009, Great Plains

filed a Uniform Commercial Code (UCC) financing statement with the Oklahoma Secretary of State's office reflecting this interest. Great Plains also filed an effective financing statement (EFS) in Oklahoma, as required by the FSA, on December 17, 2009.

¶ 4 *The Cattle Consultants security interest.* On February 15, 2010, Mount, a Colorado cattleman, agreed to purchase 206 head of cattle from Smith after inspecting Smith's cattle in Oklahoma on January 23, 2010. That same day, Cattle Consultants financed Mount's purchase, and Mount granted Cattle Consultants a security interest in the 206 head of cattle.[1] Cattle Consultants filed a UCC financing statement with the Colorado Secretary of State on March 8, 2010, reflecting its interest in Mount's cattle.

¶ 5 *Mount's cattle purchase.* Although Mount believed he was buying 206 head of Smith's cattle located in Oklahoma, Smith actually fulfilled the purchase agreement with cattle he had just bought on February 14, 2010, from a cattle broker in Missouri.

¶ 6 On February 18, 2010, Smith received a shipment of 231 head of cattle from the Missouri cattle broker. The next day, after a veterinarian examined the cattle, Smith loaded 206 of these cattle onto trucks bound for Colorado. Mount paid to ship the 206 head of cattle from Oklahoma to Colorado.

¶ 7 *Smith's payment for the Missouri cattle.* When Smith paid the Missouri cattle broker, he wrote a check with insufficient funds, but Great Plains covered the check. Great Plains attempted unsuccessfully to recoup this money from Smith. Consequently, in April 2010, Great Plains sought to enforce its security interest in the 206 head of cattle purchased by Mount, and filed a UCC financing statement against Smith in Colorado.

¶ 8 All parties sought summary judgment, and the district court ruled in favor of Great Plains. The court concluded that the cattle were "produced in" Oklahoma, such that under the FSA, 7 U.S.C. § 1631, Mount's purchase was subject to Great Plains' financing statement filed in that state. The court further found that under the UCC, Cattle Consultants' security interest in the cattle was junior to that of Great Plains. Mount and Cattle Consultants each appeals that judgment.

## II. Standard of Review

¶ 9 We review an order granting or denying summary judgment de novo. *Lombard v. Colo. Outdoor Educ. Ctr., Inc.,* 187 P.3d 565, 570 (Colo.2008). Summary judgment is proper when the pleadings and supporting documents demonstrate that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Id.* The nonmoving party is entitled to the benefit of all favorable inferences drawn from the undisputed facts, and any doubt as to issues of material fact must be resolved against the moving party. *Id.*

## III. Mount's Appeal

¶ 10 Mount contends that the district court's interpretation of the phrase "produced in," as used in the FSA, led it to wrongly conclude that Mount purchased the 206 head of cattle subject to the security interest claimed by Great Plains. On review, the question we must answer is whether Mount's cattle were "produced in" Oklahoma. If so, Mount took the cattle subject to the Great Plains security interest because Great Plains filed its EFS in Oklahoma. If not, Mount took the cattle free and clear of the Great Plains security interest. We conclude the cattle were "produced in" Oklahoma for FSA purposes.

¶ 11 We review statutory construction de novo. *Spahmer v. Gullette,* 113 P.3d 158, 161–62 (Colo.2005). Our primary goal when construing a statute is to determine and give effect to legislative intent. *Id.* Because we are construing a federal statute, we turn to well-established rules of federal statutory interpretation. *See Copeland v. MBNA Am. Bank,* 907 P.2d 87, 90 (Colo. 1995). Therefore, we look first to the plain language of the statute, giving words and phrases their plain and ordinary meaning. *Roberts v. Sea–Land Servs., Inc.,* —— U.S. ——, ——, 132 S.Ct. 1350, 182 L.Ed.2d 341

---

1. Cattle Consultants also loaned Smith money, a transaction which is not a subject of this appeal.

(2012); *see also Spahmer*, 113 P.3d at 161–62.

¶ 12 Statutory language "cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989); *accord Jefferson Cnty. Bd. of Equalization v. Gerganoff*, 241 P.3d 932, 935 (Colo.2010). Furthermore, the statute must be interpreted to give consistent, harmonious, and sensible effect to all its parts, avoiding interpretations that would render any words or phrases superfluous. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). We must also avoid interpretations that would lead to illogical or absurd results. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982).

¶ 13 When statutory language is unclear, ambiguous, or susceptible of different interpretations, we look to sources of legislative intent, including legislative history, the statute's declaration of purpose, the object the legislature sought to obtain by the enactment, the circumstances under which it was adopted, and the consequences of a particular construction. *See Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486, 126 S.Ct. 1252, 163 L.Ed.2d 1079 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis."); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 608, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979) (our task is to interpret the words of the statute in light of the purposes Congress sought to serve); *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 543–44, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940) ("When aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which

forbids its use, however clear the words may appear on 'superficial examination.'" (footnote omitted)); *see also* § 2–4–203, C.R.S. 2011 (suggesting aids in construction of ambiguous statutes).

¶ 14 Here, we are called upon to construe the FSA to determine whether Mount's purchase of the cattle is subject to the Great Plains security interest, because the pertinent provision of the Colorado UCC and its official comment, provide that a transaction of this type is governed, not by the Colorado UCC, but by the FSA. Mount concedes as much. Under the Colorado UCC, a "buyer in ordinary course of business, *other than a person buying farm products from a person engaged in farming operations,*[2] takes free of a security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its existence." § 4–9–320(a), C.R.S.2011 (emphasis added). Mount acknowledges that he purchased farm products from a person engaged in farming operations, and, therefore, relies on the official UCC comment to this provision, which states that "a buyer of farm products may take free of a security interest under [the FSA], 7 U.S.C. § 1631." § 4–9–320 cmt. 4, C.R.S.2011. Thus, the determination of whether Mount took subject to the security interest claimed by Great Plains requires analysis of the FSA.

¶ 15 Under the FSA, buyers of farm products generally take free of a security interest created by the seller. However, the FSA sets out an exception to this general rule:

A buyer of farm products takes subject to a security interest created by the seller if—

. . .

(2) in the case of a farm product *produced in* a State that has established a central filing system—

(A) the buyer has failed to register with the Secretary of State of such State prior to the purchase of farm products; and

**2.** Under the UCC, "farm products" includes "livestock" and "farming operations" includes raising, fattening, grazing, or any other farming or livestock operation. § 4–9–102(34)–(35),

C.R.S.2011. Similarly, the FSA's definition of farm products specifically includes cattle. 7 U.S.C. § 1631(c)(5) (2011).

(B) the secured party has filed an effective financing statement or notice that covers the farm products being sold....

7 U.S.C. § 1631(e) (2011) (emphasis added).

¶ 16 In its summary judgment order, the district court found that the 206 head of cattle were "produced in" Oklahoma, where there is a central filing system, and because Mount did not register in Oklahoma and Great Plains made a proper filing there, Great Plains retained its security interest. Mount challenges this order on appeal, contending that the cattle were "produced in" Missouri, which has no central filing system. Thus, the resolution of whether Mount took subject to the security interest claimed by Great Plains turns on whether the cattle were "produced in" Missouri or in Oklahoma.

■ ¶ 17 The FSA does not define "produced in." We are unaware of, and the parties have not directed us to, any case law defining the phrase as used in the FSA. Consequently, we give the phrase its plain and ordinary meaning, which may include consideration of dictionary definitions. *See Roberts*, —— U.S. at ——, 132 S.Ct. 1350 (considering dictionary definitions of "award").

¶ 18 According to *Webster's Third New International Dictionary* 1810 (2002), "produced" is the past tense of the verb "produce," which has several meanings, including the location from which a product "originate[s]," or the location where a person "grow[s], make[s], or furnish[es] economically valuable products." *Id.* Because "produced in" is susceptible of multiple meanings, we conclude the phrase as used in the FSA is ambiguous. *See id.; see also* Keith Meyer, *A Potpourri of Agricultural U.C.C. Issues: Attachment, Real Estate–Growing Crops and Federalization*, 12 Hamline L.Rev. 741, 767 (1989) (the FSA is "replete with ambiguities, inconsistencies, omissions and confusion," such as "whether the law of the state where the farm product is produced controls when the farm product is sold in another state"); *but compare, e.g.,* Mark V. Bodine, Note, *Clear Title: A Buyer's Bonus, A Lender's Loss—Repeal of UCC § 9–307(1) Farm Products Exception by Food Security Act § 1324 [7 U.S.C. § 1631]*, 26 Washburn L.J.

71, 94–95 (1986) (if the state where a farm product is "produced" has established a central filing system, a buyer takes subject to any filed security interests covering the products, even if the farm product is sold in a different state), *with, e.g.,* Daniel P. Johnson, Comment, *Federal Legislation Provides Protection for Buyers of Farm Products: Food Security Act Supersedes the Farm Products Exception of UCC Section 9–307(1)*, 47 U. Pitt. L.Rev. 749, 770–71 (1986) ("Under the central filing system approach, creditors may protect their security interests by filing effective financing statements with the Secretary of State for each state in which their farm debtors sell their products." (footnote omitted)). Accordingly, we turn to the legislative purpose of the FSA, legislative history, and the consequences of particular constructions to discern the meaning of the phrase. *See Am. Trucking*, 310 U.S. at 543–44, 60 S.Ct. 1059; *see also* § 2–4–203.

¶ 19 Congress expressly stated the purpose of the FSA within the statute itself. 7 U.S.C. § 1631(b) (2011). In defining this purpose, Congress found that certain state laws permitted lenders to enforce liens against buyers of farm products even when the buyer did not know of the security interest and "lack[ed] any practical method for discovering the existence of the security interest." 7 U.S.C. § 1631(a)(1) (2011). As a result, purchasers of farm products were exposed to double payment which created a "burden on and an obstruction to interstate commerce in farm products." 7 U.S.C. § 1631(a)(2)-(4) (2011). Consequently, the FSA was implemented to remove these burdens and obstructions. 7 U.S.C. § 1631(b).

¶ 20 Mount urges on appeal that, in order to effectuate this legislative purpose, we should adopt an interpretation that removes the burden on Mount as a purchaser of farm products, and, thus, "produced in" should be interpreted to mean the "geographic origin" of farm products and not the location from which the product is sold. Notwithstanding Mount's argument to the contrary, this narrow interpretation would defeat the purpose of the FSA.

¶ 21 As demonstrated by this case, a purchaser of farm products may not know where those products originated. Mount acknowledged in his deposition that he believed he bought cattle from Oklahoma and only later discovered that Smith had acquired the cattle in Missouri. Thus, Mount's interpretation could result in buyers purchasing farm products subject to security interests they had no practical method of discovering; the exact problem the FSA was implemented to address.

¶ 22 Mount's interpretation would, in fact, place a burden on buyers to inquire into the origin of each individual farm product they purchase, investigate whether those states have central filing systems, and then register in the states with central filing systems to ensure that they take each product free of any security interests that may encumber it. Congress intended to simplify the process by which buyers could discover security interests in farm products, not complicate it. *See* 131 Cong. Rec. S16248–02 (daily ed. Nov. 22, 1985) (statement of Sen. Cochran) (buyers are required to register only in states "where their sellers might have borrowed," and "the risk of any error that might escape the attention of a reasonably diligent buyer" is more appropriately placed upon the lender).

¶ 23 Because the FSA is focused on ensuring buyers can obtain adequate notice of potential security interests in farm products, the meaning of "produced in" should be interpreted to reflect that focus. Accordingly, we conclude that "produced in," as used in this context, means the location where farm products are furnished or made available for commerce. Such an interpretation allows lenders to discern where they must file notice of their security interests and ensures a practical means for buyers to discover otherwise unknown security interests in farm products, as Congress intended. 7 U.S.C. § 1631(a)-(b); *see also* H.R.Rep. No. 99–271(I), at 109–10 (1985), 1985 U.S.C.C.A.N. 1103 at 1210–11 (the FSA was intended to create a "universal rule" preempting state laws forcing "innocent buyers of farm products to become unwilling loan guarantors").

¶ 24 Prior case law is consistent with our interpretation. Although no previous cases have interpreted "produced in" as used in the FSA, many cases involving the FSA focus on the state in which a sale of farm products takes place. *See, e.g., Peoples Bank v. Bryan Bros. Cattle Co.,* 504 F.3d 549, 552–54 (5th Cir.2007) (noting that the state where the cattle were sold had a central filing system with no mention of the location where the cattle originated, despite the fact that the cattle were not born on the seller's property and were purchased by the seller from other parties); *Fin–Ag, Inc. v. Pipestone Livestock Auction Market, Inc.,* 754 N.W.2d 29, 33–37 (S.D.2008) (concluding, with no mention of where the cattle originated, that the FSA extinguished security interests in cattle that were not listed in the central filing system of the state where the sales took place, even though the seller routinely purchased and later sold cattle at auction).

¶ 25 Legislative history also suggests that "produced in" means the state in which a sale of farm products takes place. When introducing the amendment to the FSA adding provisions regarding central filing systems, the sponsoring senator stated those provisions "would impose upon lenders the relatively simple burden of filing financing statements with the office of the Secretary of State . . . in any State in which lenders anticipated their creditors might sell their products." 131 Cong. Rec. S16248–02 (daily ed. Nov. 22, 1985) (statement of Sen. Cochran). "Buyers would not be permitted to be passive, but they would not be required to be hyperactive either." *Id.* Unlike the state-created central filing systems at the time which involved rather cumbersome searches of county or state records, under the FSA buyers would only need to register to receive a list reflecting filed security interests in those states "where their sellers might have borrowed." *Id.* "If they failed to register, they would purchase farm products subject to any lien on file in an effective financing statement." *Id.* Thus, Congress intended "produced in" to encompass more than the origin of farm products.

¶ 26 Other provisions of the FSA also support our interpretation. *Davis,* 489 U.S. at

809, 109 S.Ct. 1500 (statutory language must be interpreted in light of the statute as a whole). Indeed, the FSA requires an EFS to include a description of the farm products encumbered by a security interest and the county or parish where those farm products are "produced or located." 7 U.S.C. § 1361(c)(4) (2011). Thus, the FSA contemplates filings in places other than where farm products originated. *Id.; see also* 9 C.F.R. § 205.210 (2011) (the FSA provides for the filing of an EFS in the state in which a farm product is "produced or located" and buyers not registered in that state take subject to the security interest, even if it is unknown and they are in another state).

¶ 27 Finally, our interpretation is consistent with state secured transaction law in which a secured party must perfect its interest in the jurisdiction in which the collateral is located. *See* § 4–9–316(a)(b), C.R.S.2011 (once collateral is moved to this state, a secured party must perfect its security interest within this state to maintain perfection).

¶ 28 Here, the cattle were furnished and made available by Smith, an Oklahoma resident, for inspection and purchase in Oklahoma. Not only did Mount believe he was purchasing cattle in Oklahoma, but, as the district court determined and the parties stipulated, Smith delivered the cattle to Mount in Oklahoma. *See Denver–Chicago Trucking Co. v. Republic Drug Co.*, 134 Colo. 461, 463, 306 P.2d 1076, 1077–78 (1957) (delivery by the seller to a carrier for shipment to the buyer constitutes delivery to the buyer). Accordingly, the cattle were "produced in" Oklahoma.

¶ 29 Thus, we apply this construction of the statute in our de novo review of the district court's summary judgment order. According to the undisputed facts, Oklahoma has a central filing system and Great Plains filed an EFS covering Smith's cattle there. Mount did not register.

¶ 30 Had Mount registered in Oklahoma, or inquired into potential security interests with the Oklahoma Secretary of State, he would have discovered the security interest claimed by Great Plains. *See* 7 U.S.C. § 1631(c)(2) (2011) (registered buyers are regularly provided with notice of filed EFSs and nonregistered buyers are provided with notice when they request the information). Because Mount did not register, the FSA does not protect him from this security interest. Accordingly, we agree with the district court and conclude that Mount purchased the cattle subject to the perfected security interest claimed by Great Plains.

## IV.   Cattle Consultants' Appeal

¶ 31 Cattle Consultants asserts that the district court erred in holding that its security interest was junior to the Great Plains security interest for two reasons. First, it contends that Mount, and not Smith, owned the 206 head of cattle when they entered Oklahoma, and, therefore, Great Plains did not have a security interest in the cattle. Second, it contends that its purchase-money security interest (PMSI) in the 206 head of cattle purchased by Mount had priority over any competing security interest. We are not persuaded.

### A.   Did Great Plains Have a Security Interest?

¶ 32 Cattle Consultants claims that title to the 206 head of cattle transferred to Mount in Missouri when they were identified at an auction barn in Joplin and loaded onto trucks to be transported ultimately to Colorado, and, therefore, Smith had no rights in the cattle when they entered Oklahoma. Thus, according to this argument, the Great Plains security interest could not have attached to the cattle. Not only is this argument inconsistent with the stipulated facts, as the district court found, but it also misconstrues the requirements for attachment.

¶ 33 Article 9 of the UCC governs security interests. A security interest is said to "attach" when it is "enforceable against the debtor with respect to the collateral." § 4–9–203(a), C.R.S.2011.[3] A security inter-

---

3. Although the passage of the cattle between several states implicates the local laws of each state, the Uniform Commercial Code (UCC) pro- vides the substantive law in this case and, consequently, the pertinent UCC law from each state is identical. *See* § 4–9–101 to –710, C.R.S.2011;

est in after-acquired collateral is no less valid than a security interest in collateral in which the debtor has rights at the time value is given. § 4–9–204 cmt. 2, C.R.S.2011.

¶ 34 Under the UCC, a security interest is enforceable against a debtor and third parties with respect to the collateral, when three requirements are met: (1) value is given; (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and (3) the debtor has signed a security agreement that provides a description of the collateral. § 4–9–203(b), C.R.S. 2011.

¶ 35 Here, it is undisputed that Great Plains gave value to Smith; Great Plains previously lent money to Smith and also financed (albeit unintentionally) his purchase from the Missouri cattle broker.

¶ 36 And, according to the stipulation to undisputed facts, Smith acquired an ownership right in the 206 head of cattle. He purchased 764 head of cattle from the Missouri cattle broker on February 14, 2010. Then, on February 15, 2010, Mount agreed to purchase 206 head of cattle from Smith. Thus, as the district court determined, Smith acquired rights in the 764 head of cattle, for however brief a time, before loading 206 of them into trucks in Oklahoma for transport to Mount in Colorado. *See* 4–9–203 cmt. 6, C.R.S.2011 (even limited rights, short of full ownership, are sufficient for a security interest to attach); *see also Bellrose v. Denver Florists Fed. Credit Union,* 682 P.2d 1224, 1226 (Colo.App.1983) ("To have rights in the collateral a debtor ... must at least have some degree of control or authority over the collateral.").

¶ 37 Finally, Smith signed a security agreement granting Great Plains an interest in "all cattle" he owned or later acquired.

¶ 38 Therefore, the requirements for attachment were met and the district court did not err in holding that the Great Plains security interest attached to the cattle.

Mo.Rev.Stat. § 400.9–101 to–710 (2011); 12A Okla. Stat. Ann. § 1–9–101 to –710 (2011). Although Oklahoma and Missouri law technically

### B. Did the PMSI Have Priority over Other Security Interests?

¶ 39 Cattle Consultants also contends that the district court erred in failing to conclude that its PMSI had priority over all other security interests. We perceive no error.

¶ 40 Security interests may be perfected in a number of ways. *See* §§ 4–9–308 to –316, C.R.S.2011. Pertinent here, a previously filed financing statement causes a security interest to perfect when it attaches. § 4–9–308(a), C.R.S 2011. Possession may also perfect a security interest. § 4–9–313, C.R.S. 2011.

¶ 41 When determining the priority of conflicting security interests, typically the first to file or perfect has priority:

Conflicting perfected security interests ... rank according to priority in time of filing or perfection. Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest ... is first perfected, if there is no period thereafter when there is neither filing nor perfection.

§ 4–9–322(a)(1), C.R.S.2011. However, a PMSI may be afforded special priority over other conflicting security interests, regardless of time of filing or perfection, when certain criteria are met. § 4–9–324, C.R.S. 2011. A PMSI is a security interest in goods that secures an obligation "incurred as all or part of the price of the collateral." § 4–9–103(a)(2), C.R.S.2011.

#### 1. First to File or Perfect

¶ 42 Here, Great Plains filed its financing statement on November 19, 2009. This filing was done before Smith acquired rights in the cattle and, therefore, the security interest perfected at the moment of attachment. § 4–9–308(a). Great Plains then filed a financing statement in Colorado within one year of the transfer of the cattle to Colorado. *See* §§ 4–9–308(c), 4–9–316(a)(3), (b), C.R.S.2011 (a security interest perfected in another state remains perfected if the secured party files a

apply to some aspects of the transaction, for convenience we refer only to Colorado statutes.

financing statement in this state within one year of a transfer of collateral to a person located here). Therefore, Great Plains had a perfected security interest dating back to November 2009, when it filed its financing statement. *See* § 4–9–322(a)(1) (ranking priority date as the date of the *filing* of the security interest).

¶ 43 Cattle Consultants did not file a financing statement reflecting its interest in the cattle until March 2010. Because Great Plains was the first to file, its security interest has priority. *Id.*

¶ 44 For two reasons, we reject Cattle Consultants' argument that Mount's purchase or his possession of the cattle affected the Great Plains security interest. First, contrary to Cattle Consultants' contention, Mount did not purchase the cattle free of the security interest claimed by Great Plains as a "buyer in the ordinary course of business" under section 4–9–320, C.R.S.2011. This statute is inapplicable to Mount by its own terms, because Mount was a "person buying farm products from a person engaged in farming operations." *Id.; see also* § 4–9–315(a)(1), C.R.S.2011 (except as otherwise provided in the UCC, a security interest continues in collateral notwithstanding sale thereof unless the secured party authorized the disposition free of the security interest).

¶ 45 Second, we reject Cattle Consultants' contention that Mount took possession of the cattle in Missouri, thus perfecting its security interest through constructive possession. The district court concluded, and we agree, that Cattle Consultants did not perfect its security interest through possession, because collateral must be possessed by the secured party, not the debtor, in order to be perfected. *See* § 4–9–313(a), (c), C.R.S 2011.

¶ 46 Therefore, as the district court determined, Great Plains has priority unless Cattle Consultants can claim special priority under the PMSI rules.

## 2. PMSI

¶ 47 The district court correctly found, and it is undisputed, that Cattle Consultants had a PMSI in the cattle. Indeed, Mount in-

curred an obligation to Cattle Consultants in order to purchase the cattle from Smith. However, a PMSI in livestock is only given special priority over conflicting security interests when four requirements are met:

(1) The purchase-money security interest is perfected when the debtor receives possession of the livestock;

(2) The purchase-money secured party sends an authenticated notification to the holder of the conflicting security interest;

(3) The holder of the conflicting security interest receives the notification within six months before the debtor receives possession of the livestock; and

(4) The notification states that the person sending the notification has or expects to acquire a purchase-money security interest in livestock of the debtor and describes the livestock.

§ 4–9–324(d), C.R.S.2011.

¶ 48 Here, the record indicates that Cattle Consultants failed to file a financing statement or otherwise perfect its security interest at the time of or prior to Mount's possession of the cattle. *See* § 4–9–324(d)(1); *see also* § 4–9–313(c). Rather, Cattle Consultants did not perfect its security interest until March 8, 2010.

¶ 49 It is also undisputed that Cattle Consultants did not send any notification to Great Plains regarding its PMSI in the cattle. As a result, Cattle Consultants did not fulfill the statutory requirements necessary to obtain special priority for its PMSI. Consequently, we agree with the district court that the Great Plains security interest had priority over Cattle Consultants' PMSI.

¶ 50 The judgment is affirmed.

Judge LOEB and Judge BERNARD concur.